**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DENISH BHAVSAR and SAMHITA GERA, derivatively on behalf of BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORPORATION I, | C.A. No. |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| vs. | |
| TODD M. FRUCHTERMAN, STEPHANIE FIELDING, JONATHAN M. ROTHBERG, LARRY ROBBINS, DAWN CARFORA, ELAZER EDELMAN, JOHN HAMMERGREN, GIANLUCA PETTITI, LOUISE PHANSTIEL, ERICA SCHWARTZ, JOHN RODIN, MARK HOROWITZ, WESTLEY MOORE, DEREK CRIBBS, RANDY SIMPSON, and LONGVIEW INVESTORS LLC | |
| Defendants, | |
| and | |
| BUTTERFLY NETWORK, INC. F/K/A LONGVIEW ACQUISITION CORPORATION I, | |
| Nominal Defendant. | |

<u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u>

<u>**INTRODUCTION**</u>

Plaintiffs Denish Bhavsar and Samhita Gera ("Plaintiffs"), by Plaintiffs' undersigned

attorneys, derivatively and on behalf of Nominal Defendant Butterfly Network, Inc., f/k/a

Longview Acquisition Corporation I ("Butterfly" or the "Company"), file this Verified

Shareholder Derivative Complaint against Todd M. Fruchterman ("Fruchterman"), Stephanie

Fielding ("Fielding"), Jonathan M. Rothberg ("Rothberg"), Larry Robbins ("Robbins"), Dawn

Carfora ("Carfora"), Elazer Edelman ("Edelman"), John Hammergren ("Hammergren"), Gianluca Pettiti ("Pettiti"), Louise Phanstiel ("Phanstiel"), Erica Schwartz ("Schwartz"), John Rodin ("Rodin"), Mark Horowitz ("Horowitz"), Westley Moore ("Moore"), Derek Cribbs ("Cribbs"), Randy Simpson ("Simpson"), and Longview Investors LLC (the "Sponsor") (collectively, the "Individual Defendants," and together with Butterfly, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Butterfly, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, violations of Sections 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and/or the aiding and abetting thereof, and against Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson for contribution under Sections 11(f) of the Securities Act and 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Butterfly, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by Butterfly's directors and officers from January 26, 2021 through November 3, 2022, both dates inclusive (the "Relevant Period").

2.      Butterfly is a digital health company that purports to develop and sell ultrasound imaging devices "with a mission of democratizing healthcare by making medical imaging accessible to everyone around the world." During the Relevant Period, Butterfly had two products on the market, the iQ, and its updated edition, the iQ+. Both products are handheld ultrasound probes that connect to smartphones or tablets to display ultrasound images. Butterfly no longer sells iQ but still sells iQ+. To manufacture these sophisticated products, Butterfly engages third-party entities to manufacture the microchips needed for the ultrasound probes and other third-party entities to assemble the ultrasound probes. These third-party entities normally require Butterfly to enter non-cancellable contracts that feature minimum product purchasing requirements that are based upon sales forecasts Butterfly creates and provides to the third-party entities in advance.

3.      Longview Acquisition Corporation I ("Longview") previously operated as a special purpose acquisition company ("SPAC"), a publicly traded corporation with a two-year life span formed with the sole purpose of effecting a merger, or "combination," with a privately held business to enable it to go public. Longview was created by Glenview Capital Management LLC ("Glenview"), a healthcare-focused private equity fund led by Defendant Robbins, who is Glenview's founder, Portfolio Manager, and Chief Executive Officer ("CEO"), and Defendant Rodin, who is Glenview's Co-President and Partner.

4.      The Company is the result of a business combination that closed on February 16, 2021 (the "Merger") with Butterfly Network, Inc. ("Legacy Butterfly"), a private company founded in 2011 by Defendant Rothberg. Unbeknownst to the shareholders who approved the Merger, (i.e., Longview's shareholders), the value of the Merger was not in line with Defendants' representations. In fact, through the Merger, Longview inherited a business that was a far cry from

revolutionizing the ultrasound technology-healthcare market and offered little in the way of financial growth or success. By making false and misleading statements regarding the capabilities of Legacy Butterfly's hardware products and software products and Longview's due diligence of Legacy Butterfly prior to the Merger, Defendants successfully deceived the investing public into approving the Merger, and with it, lucrative arrangements that materially benefitted insiders at Longview and Legacy Butterfly to the Company's detriment. The full truth remained hidden from investors until many months after the Merger closed and the value of the Company's securities tanked to new lows.

5.      Longview was incorporated in Delaware on February 4, 2020. Longview's most significant investor was the Sponsor, which was managed and controlled by Defendants Robbins, Rodin, Moore, Cribbs, and Simpson. Several of the Individual Defendants were direct or indirect members of the Sponsor.

6.      Initially, as noted in its draft registration statement filed with the SEC on November 27, 2020, Longview's stated business targets were companies in the healthcare technology industries. Indeed, Longview's directors and officers held themselves out to investors as highly experienced in the healthcare technology and finance industries, which they repeatedly stated would be Longview's focus for completing a merger.

7.      Prior to Longview's initial public offering ("IPO"), the Sponsor purchased an aggregate of 8,625,000 shares of common stock from Longview for an aggregate purchase price of $25,000 in cash, or approximately $0.0024 per share (the "Founder Shares"). In April 2020, the Sponsor transferred 25,000 of the Founder Shares to each of Defendants Moore, Cribbs, and Simpson, who served as three of Longview's directors.

8.       On May 20, 2020, Longview effected a stock dividend with respect to its Class B common stock, resulting in the Sponsor holding an aggregate of 10,275,000 Founder Shares with 10,350,000 Founder Shares outstanding, thereby ensuring that the Sponsor would retain approximately 20% of the total issued and outstanding shares of Longview upon the consummation of Longview's IPO. Through the issuance of the Founder Shares, the Sponsor, and by their joint control of the Sponsor, Defendants Robbins, Rodin, Moore, Cribbs, and Simpson, collectively owned approximately 20% of Longview's issued and outstanding shares of common stock as of the date of the Merger Proxy Statement (defined below). The Merger Proxy Statement reported that each of Defendants Robbins, Rodin, Moore, Cribbs, and Simpson may be deemed the beneficial owner of the Founder Shares held by the Sponsor.

9.       On May 26, 2020, Longview closed its IPO, selling 36,000,000 units at $10.00 per unit. On June 9, 2020, Longview sold an additional 4,000,000 units to the underwriters upon the underwriters' election to partially exercise their over-allotment option, and on June 26, 2020, in connection with the underwriters' election to exercise their remaining over-allotment option, Longview sold an additional 1,400,000 units to the underwriters, for a total offering size of 41,400,000 units and generating gross proceeds of $414,000,000. In addition, Longview issued units to the Sponsor in a private placement that occurred simultaneously with the closing of the IPO. Specifically, the Sponsor purchased an aggregate of 6,853,333 private placement warrants at a price of $1.50 per private placement warrant, for a purchase price of $10,280,000 (the "Private Placement Warrants").

10.       Following the closing of Longview's IPO, $414,000,000 of the net proceeds generated from the IPO and simultaneous private placement were placed in a trust account (the "Trust"), and these funds were to be released only upon the closing of a qualifying business

combination, or in the case of liquidation to return the funds to Longview's investors. The Trust was established to safeguard two key rights held by Longview shareholders under Longview's Charter: (1) the right to redeem their shares at $10.00 per share price instead of investing in the business combination; and (2) in the event Longview was unable to timely complete the business combination, the right to receive a return of all IPO proceeds.

11.     However, as certain of the Individual Defendants had either a direct or indirect economic interest in the Founder Shares and Private Placement Warrants, their financial interests were misaligned with those of Longview shareholders. These conflicts of interest only worsened once Longview determined it would complete a business combination with Legacy Butterfly. Pursuant to Longview's Charter, Longview had until May 26, 2022 to complete a business combination. This meant that, in the event Longview failed to complete a business combination by that time, Longview would have had to: (1) cease all its operations, except those made for the purposes of winding up the Company's affairs and liquidating; (2) redeem public shares; and (3) dissolve and liquidate the funds held in the Trust to return to Longview's investors. Because each of Longview's officers and directors agreed to waive their rights to liquidating distributions from the Trust, the $414 million in Founder Shares and Private Placement Warrants would have been rendered worthless to them in the event Longview failed to timely complete a business combination.

12.     Driven by their strong motivations to avoid liquidation of the Trust and cash out on their investments, the Individual Defendants affiliated with Longview were highly motivated to facilitate a business combination with just about any company. Despite repeatedly representing to investors prior to and after its IPO that it planned to merge with a healthy, qualified company specializing in the technology industry, by mid-2020, Defendants Robbins, Rodin, Moore, Cribbs,

and Simpson had begun engaging Defendant Rothberg for purposes of effectuating a Merger with Legacy Butterfly, a company plagued by issues arising from, among other things, faulty internal controls over financial reporting and unproven products, including a software system just beginning development.

13.     Between the end of September 2020 and February 2021, Longview and its advisors repeatedly represented to investors that they had conducted substantial due diligence of Legacy Butterfly in anticipation of the proposed merger. In reality, Butterfly's due diligence of Legacy Butterfly was glaringly inadequate, as it unreasonably failed to: (1) investigate and confirm Legacy Butterfly's claims about having a software that was "fully integrated into the clinical workflow" and was a "complete solution" to medical imaging; or (2) investigate large healthcare institutions ("Enterprise Customers"), such as hospitals, concerns surrounding Legacy Butterfly's questionable ultrasound probes' functionality, worth, and dependability.

14.     This information was highly material to investors. The Company's plan to provide a full-service software solution—which Legacy Butterfly claimed was "fully integrated into the clinical workflow" and was designed to teach customers how to use the ultrasound probes, lacked functionality and was not even needed by Enterprise Customers. Indeed, during the Relevant Period, former employees who served as confidential witnesses in the Securities Class Action (defined below) explain that physicians and practitioners already knew how to use the ultrasound probes without any software, and in any event, were not interested in purchasing ultrasound probes *at all* until the technology was proven. Unbeknownst to the investing public, however, Legacy Butterfly's software was not functional, but was rather in its early stages of development. In addition to the proof-of-concept-stage software, Legacy Butterfly was also plagued by its obligations to purchase minimum amounts of inventory from third-party vendors in China,

Taiwan, and Thailand. Indeed, these contracts required Legacy Butterfly to purchase component parts of ultrasound products, like microchips, even if Legacy Butterfly was not in need of them, which caused significant strain on the Company's financial health and overall bottom line. As a result, Legacy Butterfly artificially inflated its sales forecasts to make the Company appear more viable and successful than it was. These concerns were significant to the investing public, as the Company's software and, relatedly, ability to manufacture and sell its ultrasound products effectively and efficiently, were essential to performing its operations.

15.     On November 20, 2020, Longview issued a press release announcing that it had entered into a Business Combination Agreement with Legacy Butterfly and Clay Merger Sub Inc. ("Merger Sub") (the "Merger Agreement"). Pursuant to the terms of the Merger Agreement, upon consummation of the Merger, Merger Sub would merge with and into Legacy Butterfly, the separate corporate existence of Merger Sub would cease, and Legacy Butterfly would become the surviving corporation and a wholly owned subsidiary of Longview. Longview would then immediately be renamed Butterfly Network, Inc.

16.     On January 26, 2021, Longview filed a proxy statement with the SEC (the "Merger Proxy Statement"). The Merger Proxy Statement was solicited by the Board of Directors of Longview, including Defendants Rodin, Horowitz, Moore, Cribbs, and Simpson, who purportedly approved the Merger Agreement "after careful consideration" and recommended that Longview shareholders approve the Merger, the 2020 Equity Incentive Plan (the "Incentive Plan"), and the election of seven directors (including Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel) to the post-Merger Company's Board. The Merger Proxy Statement represented to investors that the aggregate value of the consideration to be paid by Longview in the Merger was approximately 164,862,472 Class A shares and 26,426,937 Class B

shares of "New Butterfly" common stock issued by Longview, calculated as follows: (i) 17,500,000 shares to the PIPE Investors as consideration for their public equity ("PIPE") financing ("Butterfly PIPE Investors") and (ii) 41,400,000 shares of Butterfly common stock priced at $10.00 per share to Longview's shareholders. As a result, Legacy Butterfly shareholders received significant shares in the post-Merger Company from the Company that were more valuable than what Legacy Butterfly was worth, thereby damaging the Company.[1]

17.     The Merger Proxy Statement included a series of false and misleading statements which touted the value represented by the Merger and Legacy Butterfly. In particular, the Merger Proxy Statement contained materially false and misleading statements and omissions that failed to disclose, *inter alia*: (i) the Company misrepresented to its pre-Merger investors the nature and capabilities of Legacy Butterfly's software program; (ii) the Company's financial forecasts for 2020-2024 were patently unreasonable, inflated, and not supported by data available to the Individual Defendants; (iii) The Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers (healthcare institutions), but instead sold most of its products to home users and private individuals; (iv) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (v) as a result, the Company was already experiencing losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand;  and (vi) as a further result, the Company was already at risk of losing money from already existing purchase requirements from third-party suppliers. As a result of the material misrepresentations and

---

[1] Shareholders that did not redeem at $10 per share before the Merger closed became holders of Butterfly common stock and were damaged thereby.

omissions made by the Individual Defendants in the Merger Proxy Statement and statements leading up to the close of the Merger, shareholders were unaware of material undisclosed risks and were deceived into approving the unfavorable Merger for which the Company overpaid for Legacy Butterfly instead of redeeming their initial investments, which were valued greater than any interest they later obtained in the Company, given the true value of Legacy Butterfly (collectively, the "Overpayment Misconduct").

18.     On February 12, 2021, the Merger was approved by Longview's shareholders. By the close of trading on February 16, 2021, the first day the Company's shares began trading on New York Stock Exchange ("NYSE"), the Company's share price was $22.50 per share.

19.     As a result of Defendants' materially false and misleading statements, investors wholeheartedly believed that Butterfly would set the Company apart from its competitors, since the Company purported to have a unique ultrasound device that was "fully integrated with the clinical workflow" which spurred "strong initial adoption, excitement, and momentum" from Enterprise Customers. Indeed, the Individual Defendants told investors that Butterfly had "strong demand in enterprise right now" and that the Company would enjoy "[n]ear term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets" that would drive scale.

20.     However, plaintiffs' counsel in the Securities Class Action (defined below) interviewed five former employees of Butterfly (the "CWs"), who confirmed that the financial forecasts for at least 2021-2024 (the "2021 Financial Forecasts") were exaggerated by, at a minimum, 20%, as the figures were based entirely off assumed growth rate that the Company had never come remotely close to reaching before. Indeed, the CWs revealed that the 2021 Financial Forecasts were a "pie in the sky" that Company management did not seriously consider was

accurate, as the Company's probes did not have the functional capabilities needed by Enterprise Customers and the Company did not have an adequately staffed sales teams in the Enterprise Customer sector. Additionally, the Individual Defendants represented that the Company's probes and software "can integrate seamlessly into large health care systems" and "give enterprise customers a solution to the governance and workflow challenges" that had formerly plagued handheld ultrasound products. Contrary to the Individual Defendants representations, the Company's software was in the proof-of-concept stage, was not functional, and was therefore unattractive to Enterprise Customers. The CWs maintain that the Company was aware of this issue, and even Defendants Fielding and Fruchterman reduced sales forecasts internally in May or June 2021 to factor in the low Enterprise Customer sales and the losses from excess inventory. However, Defendants concealed this reality from investors.

21.     On May 13, 2021, the truth began to emerge when Butterfly published its first quarter of 2021 financial results, which disclosed that Butterfly's inventory balance had risen more than $10 million, or about 40%, in three months, thereby revealing that the Company was struggling to sell its products.

22.     On this news, the Company's share price dropped $1.78 per share, from a closing price of $11.23 per share on May 12, 2021 to close at a price of $9.45 per share on May 13, 2021.

23.     The truth continued to emerge a few months later, on November 15, 2021, when Butterfly published its third quarter of 2021 financial results, which revealed that Butterfly faced a $11.6 million loss from purchase commitments and would also have to significantly reduce its 2021 Financial Forecasts by $18 million, or 23%.

24.     On this news, the Company's share price dropped $1.08 per share, or 13%, from a closing price of $8.60 per share on November 12, 2021 to close at a price of $7.52 per share on November 15, 2021.

25.     The truth continued to emerge on February 28, 2022, when Butterfly issued a press release that "introduced" Butterfly Blueprint, the Company's *new* software that was depicted as "a system-wide platform designed to support the scaled deployment of ultrasound across hospitals and health systems[.]" The software purportedly "brings hospitals and health systems a complete ultrasound solution" and "[b]y integrating into health systems' clinical and administrative systems and workflows, Blueprint delivers a clinical assessment tool at scale." However, the Company's depiction of Butterfly Blueprint was largely the same depiction of the software the Company had given a year earlier in the Registration Statement, which the Company had stated *was already functional and existing* at the time of the Merger.

26.     On this news, the Company's share price dropped $0.56 per share, or 9.8%, from a closing price of $5.71 per share on February 27, 2022 to close at a price of $5.15 per share on February 28, 2022.

27.     Analysts and investors were disappointed with this news; UBS published an analyst report that same day which stated that "[in January 2022], BFLY announced its first enterprise wide deployment" and that "BFLY noted it could see another 1-2 large institutional deployments this year," meaning that the Company had only one Enterprise Customer that was scheduled to begin use of Butterfly probes during the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"). The UBS report concluded that "Net-net, BFLY is making some significant progress on its business model, but we see risk as it looks to drive a shift in care delivery, which we view as a

heavy lift and valuation gives us pause." UBS also reduced its target price for Butterfly to $5.50 per share, which was significantly less than the previous mark of $7.00.

28.     The truth did not fully emerge until November 2, 2022. That day, during an earnings conference call, Defendant Fruchterman admitted that Butterfly was "not where we needed to be in order to realize the full value of our technology and the impact to healthcare." He also stated that "[s]ome of our future partners are simply delaying implementation" and that revenue "is lower than our internal expectations due to increased challenges at the macro level."

29.     On this news, the Company's share price dropped $0.85 per share, or 17.7%, from a closing price of $4.79 per share on November 2, 2022 to close at a price of $3.94 per share on November 3, 2022.

30.     Approximately one month later, the Company revealed that Butterfly and Defendant Fruchterman had "mutually agreed" that Defendant Fruchterman would leave his position as President, CEO, and as a director. Defendant Rothberg was chosen to serve as Interim CEO.

31.     During the Relevant Period, the Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company and Legacy Butterfly. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be

rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

32.     The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

33.     The conflicts of interest that precipitated the Overpayment Misconduct, include, but are not limited to, the staggering personal financial gains received by the Individual Defendants as a result of the Merger closing. For instance, Defendant Rothberg became a controlling shareholder of a publicly traded company that had a valuation north of $1.25 billion. Likewise, Defendant Fruchterman received more than $34.8 million in 2021. Additionally, Defendant Edelman, Defendant Robbins, Defendant Carfora, Defendant Hammergren, Defendant Pettiti, Defendant Phanstiel, and Defendant Schwartz each received lucrative compensation of $450,335, $393,743, $446,371, $446,371, $446,371, $446,371, and $299,995 respectively, after the closing of the Merger. The latter amounts pale in comparison to the windfall Defendants Robbins, Rodin, Horowitz, Moore, Cribbs, and Simpson (collectively, the "Longview Defendants") received from the Merger through their interests in the Founder Shares. Indeed, the Sponsor purchased the Founder Shares for just $25,000 approximately one year before the Merger, and the Founder Shares after the Merger had a market value in excess of $184.5 million. Critically, if the Merger

did not close, the Longview Defendants would have missed out on the substantial windfalls to be received from the Founder Shares and Private Placement Warrants, which would have expired worthless had Longview failed to timely complete a qualifying business combination. Likewise, all of the Defendants who served on Butterfly's Board after the Merger, including Defendants Rothberg, Robbins, Fruchterman, Fielding, Carfora, Hammergren, Pettiti, and Phanstiel, received large grants of Butterfly restricted stock in the weeks following the Merger. Similarly, the Defendants who served on the Longview board at the time and held Founder Shares collectively received millions of dollars in profits from the closing of the Merger.

34.     Additionally, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

35.     In light of the Individual Defendants' misconduct—which has negatively impacted the value of the Company, caused the Company to be subjected to the Overpayment Misconduct and to pay unjust compensation to Defendants, subjected the Company to costly investigation, and subjected the Company to a consolidated federal securities class action lawsuit currently pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), which names Butterfly's controlling shareholder, founder and former CEO, Butterfly's former CFO and current CEO, and Longview's former board of directors as defendants—the Company will have to expend many millions of dollars.

36.     In light of the Company's directors' receipt of material benefits due to the approval of the Merger and the Incentive Plan, collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of the Individual Defendants' liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the

"Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

37.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Securities Act and the Exchange Act.

38.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

39.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

40.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that have had an effect in this District.

## PARTIES

### Plaintiffs

41.     Plaintiff Denish Bhavsar is a current shareholder of Butterfly. Plaintiff has continuously held Butterfly common stock at all relevant times.

42.     Plaintiff Samhita Gera is a current shareholder of Butterfly. Plaintiff has continuously held Butterfly common stock at all relevant times.

**Nominal Defendant Butterfly**

43.     Nominal Defendant Butterfly is a Delaware corporation with its principal executive offices located at 1600 District Avenue, Burlington, Massachusetts, 01803. Butterfly shares trade on the NYSE under the ticker symbol "BFLY" and "BFLY-WT."

**Defendant Carfora**

44.     Defendant Carfora has served as a Company director since the Merger in February 2021. She also serves as a member of the Compensation Committee. According to the Company's proxy statement filed on Schedule 14A with the SEC on May 2, 2022 (the "2022 Proxy Statement"), as of April 1, 2022, Defendant Carfora beneficially owned 16,394 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Carfora beneficially owned approximately $76,888 worth of Butterfly stock as of that date.

45.     For the "2021 Fiscal Year, Defendant Carfora received $497,163 in total compensation from the Company. This included $50,792 in fees earned, $296,033 in stock awards, and $150,338 in option awards.

46.     The 2022 Proxy Statement states the following about Defendant Carfora:

> **Dawn Carfora** has served on our board of directors since the Closing of the Business Combination in February 2021. Ms. Carfora currently serves as Vice President, Business Planning and Operations, Global Business Group of Meta Platforms, Inc. (formerly Facebook, Inc.) ("Meta") (Nasdaq:META) since September 2019. Prior to that, Ms. Carfora held a variety of senior leadership roles at Meta, including as Director, GMS Operations (Global Sales Operations) from October 2017 to September 2019 and as Director, Sales Operations, North America from March 2014 to October 2017. Ms. Carfora previously served as Chief Financial Officer of MagPlus Inc. from November 2013 to March 2014, as Senior Vice President, Operations at PDR Network, LLC ("PDR") from June 2013 to November 2013, as Chief Financial Officer at PDR from September 2009 to June 2013, and as Senior Director, Sales Operations at PDR from May 2007 to September 2009. Before joining PDR, Ms. Carfora served as Vice

President, General Manager at MediZine Inc. from April 2005 to May 2007, as Director of Finance and Operations of Primedia Inc. from 1999 to 2003, as Manager, Financial Planning & Analysis of Twentieth Century Fox Home Entertainment, Inc. in 1999, as Experienced Senior, Internal Audit Services at Ernst & Young LLP in 1998, and as Manager, Finance at Bertelsmann SE & Co. from 1993 to 1997. Ms. Carfora received her B.S. in business administration, finance from Rider University. Ms. Carfora's qualifications to serve on our board of directors include her extensive experience in management, business planning and operations.

### Defendant Cribbs

47.     Defendant Cribbs served as a director of Longview from February 2020 until the Merger. He, along with Defendants Robbins, Rodin, Horowitz, Moore, and Simpson, shared control over the Sponsor.

48.     The Merger Proxy Statement stated the following about Defendant Cribbs:

Derek Cribbs has served on the Longview Board since the completion of its initial public offering. Mr. Cribbs has served in a variety of roles in the investment management industry. Most recently, Mr. Cribbs served as the Director of Research for Roystone Capital Management LP from April 2016 to February 2019. Prior to Roystone, Mr. Cribbs was a Portfolio Manager and Sector Head at Point72 Asset Management, L.P. from October 2009 to October 2015 and, before that, a Partner at Glenview. Prior to Glenview, Mr. Cribbs worked as an Analyst and Portfolio Manager at Nittany Funds, Oppenheimer & Co. and Gleacher & Co. Mr. Cribbs earned a Bachelor's Degree from the Wharton School of the University of Pennsylvania and an M.B.A. from Harvard Business School. We believe Mr. Cribbs is qualified to serve on the Longview Board due to his significant investment experience.

### Defendant Edelman

49.     Defendant Edelman has served as a Company director since March 2021. He also serves as a member of the Technology Committee. He also serves as an advisor to Tesseract Health, a company founded by Defendant Rothberg through Defendant Rothberg's company, 4Catalyzer. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Edelman beneficially owned 5,032 shares of the Company's common stock. Given that the price per share

of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Edelman

beneficially owned approximately $23,600 worth of Butterfly stock as of that date.

50.    For the 2021 Fiscal Year, Defendant Edelman received $502,979 in total

compensation from the Company. This included $50,644 in fees earned, $299,997 in stock awards,

and $150,338 in option awards.

51.    The 2022 Proxy Statement states the following about Defendant Edelman:

> Elazer Edelman, M.D., Ph.D. has served on our board of directors since
> March 2021 and serves as the Chair of our technology committee. Dr.
> Edelman has served as the Edward J. Poitras Professor in Medical
> Engineering and Science at the Massachusetts Institute of Technology
> which he joined in 1993, Professor of Medicine at Harvard Medical School
> which he joined in 1989, and Senior Attending Physician in the coronary
> care unit at the Brigham and Women's Hospital in Boston with which he
> has been associated since 1984. He and his laboratory have pioneered basic
> findings in vascular biology and the development and assessment of
> biotechnology. Dr. Edelman has directed the Massachusetts Institute of
> Technology's Institute for Medical Engineering and Science and Clinical
> Research Center as well as the Harvard-MIT Biomedical Engineering
> Center, all dedicated to applying the rigors of the physical sciences to
> elucidate fundamental biologic processes and mechanisms of disease. He is
> the founder and has served on the board of director of Autus Valve
> Technologies, Inc. since 2019, BioDevek, Inc. since 2015, and PanTher
> Therapeutics, LLC since 2014. Dr. Edelman completed internal medicine
> training and clinical fellowship in Cardiovascular Medicine at the Brigham
> and Women's Hospital and a research fellowship at the Department of
> Pathology at Harvard Medical School. Dr. Edelman received his M.D. from
> Harvard Medical School and his Ph.D. in Medical Engineering and Medical
> Physics, M.S. in Electrical Engineering and Computer Science, and B.S. in
> Bioelectrical Engineering and Applied Biology from the Massachusetts
> Institute of Technology. Dr. Edelman's qualifications to serve on our board
> of directors include his medical and biomedical engineering background
> and his extensive scientific advisory experience and co-founding of a
> number of technology companies.

**Defendant Fruchterman**

52.    Defendant Fruchterman served as the Company's CEO, President, and as a director

from January 2021 until December 30, 2022. According to the 2022 Proxy Statement, as of April

1, 2022, Defendant Fruchterman beneficially owned 757,398 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Fruchterman beneficially owned approximately $3,552,196 worth of Butterfly stock as of that date.

53.     For the 2021 Fiscal Year, Defendant Fruchterman received $34,816,164 in total compensation from the Company. This included $687,500 in salary, $17,025,602 in stock awards, $12,586,305 in option awards, and $1,244,510 in all other compensation.

54.     The Company's 2022 Proxy Statement stated the following about Defendant Fruchterman:

> **Todd M. Fruchterman, M.D., Ph.D.** has served as our President and Chief Executive Officer and as a director of the Company since the Closing of the Business Combination in February 2021, and had served as President and Chief Executive Officer and as a director of Legacy Butterfly since February 2021. Prior to joining the Company, from November 2020 through January 2021, Dr. Fruchterman served as Group President, Reliability Solutions of Flex Ltd., where he oversaw health solutions and automotive and industrial business units. Before that, Dr. Fruchterman held several leadership roles of increasing responsibility at 3M Company, or 3M, most recently as President and General Manager, Medical Solutions, the largest division of the company, from May 2018 to September 2020. Dr. Fruchterman also served as President and General Manager, Critical & Chronic Care Solutions at 3M from August 2015 to May 2018, and as Senior Vice President R&D, Regulatory Affairs, Chief Technology Officer, and Chief Medical Officer at 3M from February 2011 to August 2015. Prior to joining 3M, Dr. Fruchterman was Executive Vice President, Chief Technology Officer and Chief Medical Officer at Kinetic Concepts, Inc. He previously held various positions at Johnson & Johnson, where he led worldwide biosurgical R&D for the Ethicon division; Schering-Plough, where he directed medical and strategic marketing for the hepatitis business; and Response Genetics, Inc., where he held the positions of President, Chief Executive Officer, and Chief Operating Officer. In addition, Dr. Fruchterman served as a member of the Board of Directors of the Advanced Medical Technology Association (AdvaMed) from October 2016 to September 2020. In 2018 and 2019, Dr. Fruchterman was also a core participant in the Innovation and Investment Summit at the U.S. Department of Health and Human Services. Dr. Fruchterman earned his M.D. from the University of Pennsylvania School of Medicine, his Ph.D. in physiology

and biophysics from the University of Louisville, and his B.A. in biological basis of behavior from the University of Pennsylvania. Dr. Fruchterman's qualifications to serve on our board of directors include his extensive leadership experience in the healthcare industry.

**Defendant Fielding**

55.     Defendant Fielding served as the Company's CFO from November 2020 until April 30, 2022. Previously, she served as the Company's Senior Vice President of Finance from April 6, 2020 until November 2020. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Fielding beneficially owned 202,295 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Fielding beneficially owned approximately $948,763 worth of Butterfly stock as of that date.

56.     For the 2021 Fiscal Year, Defendant Fielding received $755,000 in total compensation from the Company. This included $400,000 in salary and $355,00 in bonuses.

57.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Fielding made the following sale of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| March 17, 2022 | 3,269 | $5.39 | $17,619 |

Thus, in total, before the fraud was exposed, she sold 3,269 shares of Company stock on inside information, for which she received approximately $17,619 in proceeds. Her insider sale, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

58.     The Company's 2022 Proxy Statement stated the following about Defendant Fielding:

*Stephanie Fielding* has served as our Chief Financial Officer since the Closing of the Business Combination in February 2021, where she is responsible for all aspects of our financial and accounting activities. Ms. Fielding previously served as Legacy Butterfly's Chief Financial Officer from November 2021 to February 2021 and Senior Vice President of Finance from April 2020 to November 2020. Prior to joining the Company, Ms. Fielding spent over eight years at Amazon, serving from September 2019 to March 2020 as Director of Finance, Global Operations Customer Experience, where she led global finance teams in domains including customer service, customer facing delivery and reverse logistics offerings, and hardware development. Ms. Fielding also served as the Director of Finance and Analytics for Delivery Experience, from October 2017 to August 2019, as Senior Finance Manager of Delivery Finance and Analytics from June 2016 to September 2017, as Senior Manager of AWS Infrastructure FP&A from August 2014 to May 2016 and as Senior Manager of Marketing Finance for Europe. Before joining Amazon, Ms. Fielding worked in the power and energy sectors. She held several roles in the treasury and strategic marketing groups at UGI Corporation from 2009 to 2011, and was a buy-side analyst with responsibility for fixed income investments in power and energy at Delaware Investments from 2005 to 2007. Ms. Fielding received her M.B.A. from Columbia Business School and B.A. from Yale University and is a CFA® charterholder.

### Defendant Hammergren

59.     Defendant Hammergren served as a Company director since the Merger in February 2021 until January 25, 2023, when he resigned. He also served as a member of the Audit Committee and the Nominating and Corporate Governance Committee. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Hammergren beneficially owned 124,484 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Hammergren beneficially owned approximately $583,830 worth of Butterfly stock as of that date.

60.     For the 2021 Fiscal Year, Defendant Hammergren received $503,788 in total compensation from the Company. This included $57,417 in fees earned, $296,033 in stock awards, and $150,338 in option awards.

61.     The Company's 2022 Proxy Statement stated the following about Defendant Hammergren:

***John Hammergren*** has served on our board of directors since the Closing of the Business Combination in February 2021. Mr. Hammergren served as Chairman of the Board of Directors of McKesson Corporation, or McKesson, from July 2002 to April 2019, and as President and Chief Executive Officer of McKesson from April 2001 to April 2019. Mr. Hammergren joined McKesson in 1996 and held a number of management positions before becoming President and Chief Executive Officer and had been a director since 1999. Mr. Hammergren also served as the Chairman of the Supervisory Board of McKesson Europe, formerly known as Celesio AG, from March 2014 to August 2018. Mr. Hammergren also served as the Chairman of Change Healthcare, from March 2017 to March 2020. Additionally, Mr. Hammergren is currently a member of the Board of Trustees for the Center for Strategic & International Studies. Mr. Hammergren received his M.B.A. from Xavier University, Ohio and his B.A. in business administration and management from the University of Minnesota, Minneapolis. Mr. Hammergren's qualifications to serve on our board of directors include his nearly 40 years of work experience in various aspects of the supply, pharmaceutical, device, software, products and service requirements directly supporting the health care industry's care delivery objectives in the U.S. and global marketplace.

## Defendant Horowitz

62.     Defendant Horowitz served as the CFO of Longview from February 2020 until the Merger. He, along with Defendants Robbins, Rodin, Cribbs, Moore, and Simpson, shared control over the Sponsor.

63.     The Merger Proxy Statement stated the following about Defendant Horowitz:

Mark Horowitz has been Longview's Chief Financial Officer since its inception. Mr. Horowitz joined Glenview in 2004 and is a Partner and Co-President. Prior to Glenview, Mr. Horowitz was part of the senior management team of Axiom Legal Solutions Inc., a professional services outsourcing firm, which he joined at inception in 2000. Prior to Axiom, Mr. Horowitz was a corporate and securities lawyer at Cravath, Swaine & Moore and Brobeck, Phleger & Harrison. Mr. Horowitz received a J.D. from Harvard Law School in 1996 and a Bachelor of Arts in Economics from the University of Michigan in 1993, where he graduated Phi Beta Kappa with Highest Honors. We believe that Mr. Horowitz's significant investment and legal experience make him well qualified to serve as a member of the Longview Board.

## Defendant Moore

64.     Defendant Moore served as a director of Longview from February 2020 until the Merger. He, along with Defendants Robbins, Rodin, Cribbs, Horowitz, and Simpson, shared control over the Sponsor.

65.     The Merger Proxy Statement stated the following about Defendant Moore:

Westley Moore has served on the Longview Board since the completion of its initial public offering. Since March 2017, Mr. Moore has served as the Chief Executive Officer of the Robin Hood Foundation, one of the largest anti-poverty organizations in the United States. Before Robin Hood, in 2013, Mr. Moore founded BridgeEdU, an innovative technology platform addressing college completion and job placement, and served as its Chief Executive Officer until February 2017 and its Chairman until June 2019, when it was acquired. Previously, Mr. Moore worked in finance as an investment banker with Deutsche Bank and Citigroup. Mr. Moore is a best-selling author, whose works include "The Other Wes Moore," "The Work," "Discovering Wes Moore" and "This Way Home." He served as a captain and paratrooper with the U.S. Army's 82nd Airborne, including a combat deployment to Afghanistan, and as a White House Fellow to Secretary of State Condoleezza Rice. Mr. Moore graduated Phi Theta Kappa from Valley Forge Military College in 1998 and Phi Beta Kappa from Johns Hopkins University with a Bachelor of Arts in International Relations in 2001. He earned a MLitt in International Relations from Oxford University as a Rhodes Scholar in 2004. We believe that Mr. Moore is qualified to serve on the Longview Board due to his executive and entrepreneurial experience.

**Defendant Pettiti**

66.     Defendant Pettiti has served as a Company director since the Merger in February 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Pettiti beneficially owned 22,399 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Pettiti beneficially owned approximately $105,051 worth of Butterfly stock as of that date.

67.     For the 2021 Fiscal Year, Defendant Pettiti received $512,621 in total compensation from the Company. This included $66,250 in fees earned, $296,033 in stock awards, and $150,338 in option awards.

24

68.     The Company's 2022 Proxy Statement stated the following about Defendant Pettiti:

***Gianluca Pettiti*** has served on our board of directors since the Closing of the Business Combination in February 2021. Mr. Pettiti has served as Executive Vice President of Thermo Fisher Scientific Inc., or Thermo Fisher, since January 2022. Previously, Mr. Pettiti was Senior Vice President and President, Specialty Diagnostics of Thermo Fisher since October 2019. Prior to that, Mr. Pettiti held a variety of other senior leadership roles at Thermo Fisher, including as President, Biosciences from January 2018 to September 2019, as President, China from January 2015 to December 2017, as President, Greater China Life Technologies from April 2013 to December 2014, as Vice President and Chief Executive Officer, Latin America Life Technologies from March 2010 to March 2013, as Director Finance, EMEA Life Technologies from January 2009 to March 2010, and as Senior Manager, Financial Planning & Analysis - EMEA from February 2006 to December 2008. Prior to joining Thermo Fisher, Mr. Pettiti served as FP&A Manager of GE Money Bank GmbH. Mr. Pettiti served as a member of the Global Future Council on Health and Healthcare of the World Economic Forum from February 2016 to January 2019 and as a member of the Enactus China Board of Directors from January 2015 to December 2017. Mr. Pettiti earned his Master of Science in Engineering, Engineering Industrial Management, from Politecnico di Torino. Mr. Pettiti's qualifications to serve on our board of directors include his extensive leadership experience in the life sciences and diagnostics industry.

**Defendant Phanstiel**

69.     Defendant Phanstiel has served as a Company director since the Merger in February 2021. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. She is also the Chair of the Board of Myriad Genetics, Inc. ("Myriad") since 2020 and a Myriad director since 2009. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Phanstiel beneficially owned 64,434 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Phanstiel beneficially owned approximately $302,195 worth of Butterfly stock as of that date.

70.     For the 2021 Fiscal Year, Defendant Phanstiel received $514,829 in total compensation from the Company. This included $68,458 in fees earned, $296,033 in stock awards, and $150,338 in option awards.

71.     The Company's 2022 Proxy Statement stated the following about Defendant Phanstiel:

> **_S. Louise Phanstiel_** has served on our board of directors since the Closing of the Business Combination in February 2021. Ms. Phanstiel serves as Chair of the Board of Directors of Myriad Genetics, Inc., or Myriad, since March 2020 and has been a Director of Myriad since September 2009. Ms. Phanstiel previously held several executive positions at Anthem, Inc., formerly WellPoint, Inc., from 1996 to 2007. Ms. Phanstiel was President, Specialty Products, which included behavioral health services; Senior Vice President, Chief of Staff and Corporate Planning in the Office of the Chairman; and Chief Accounting Officer, Controller and Chief Financial Officer for all WellPoint, Inc. subsidiaries. Previously, Ms. Phanstiel was a partner at the international services firm PricewaterhouseCoopers, LLP, formerly Coopers & Lybrand, LLP, where she specialized in insurance. Ms. Phanstiel's life science experience includes having previously served on the Board of Directors and Chair of the Audit Committees at publicly traded companies, Inveresk Research Group, Inc. and Verastem Oncology. Ms. Phanstiel received her B.A. in accounting from Golden Gate University and is a Certified Public Accountant. Ms. Phanstiel's qualifications to serve on our board of directors include her significant experience in the healthcare industry, her extensive knowledge of financial accounting, internal control and public company reporting, and her experience serving on the board of directors of other publicly traded companies.

### Defendant Robbins

72.     Defendant Robbins has served as a Company director since February 2020. He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. He is Glenview's founder, Portfolio Manager, and CEO and was also Longview's Chairman of the Board from Longview's founding until the Merger. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Robbins beneficially owned 17,330,506 shares of the Company's common stock. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Robbins beneficially owned approximately $81,280,073 worth of Butterfly stock as of that date.

73.     For the 2021 Fiscal Year, Defendant Robbins received $442,326 in total compensation from the Company. This included $48,583 in fees earned, $243,405 in stock awards, and $150,338 in option awards.

74.     The Company's 2022 Proxy Statement stated the following about Defendant Robbins:

> **_Larry Robbins_** has served on our board of directors since February 2020. Mr. Robbins was Longview's Chairman from its inception to February 2021. Mr. Robbins is the Founder, Portfolio Manager and CEO of Glenview. Prior to founding Glenview in 2000, Mr. Robbins spent six years as an analyst and partner at Omega Advisors on their U.S. equity long/short team. He joined Omega after three years at Gleacher & Company, a merger and acquisition advisory boutique in New York. Through their Robbins Family Foundation, Mr. Robbins and his wife Sarahmay are active supporters of education reform both in New York City and on a national level. He serves as Chairman of the Board for Together Education, and he is a Board Member for the Relay Graduate School of Education, Robin Hood Foundation and Zearn. In addition, Mr. Robbins is the Senior Chair of the Wall Street Division of the UJA-Federation. Mr. Robbins graduated with honors from the Wharton School and Moore School of the University of Pennsylvania in 1992, where he received his Bachelors of Science in Economics and Engineering, with majors in accounting, finance, marketing, and systems engineering. Mr. Robbins qualifications to serve on our board of directors include his significant investment experience.

**Defendant Rodin**

75.     Defendant Rodin served as the CEO and as a director of Longview from February 2020 until the Merger. He is also a Partner and the Co-President of Glenview. He, along with Defendants Robbins, Cribbs, Horowitz, Moore, and Simpson, shared control over the Sponsor.

76.     The Merger Proxy Statement stated the following about Defendant Rodin:

> John Rodin has been Longview's Chief Executive Officer and a director since its inception. Mr. Rodin re-joined Glenview as a Partner and Co-President in August 2015. Prior to re-joining Glenview, Mr. Rodin was President of Fantex Brokerage Services, a San Francisco-based start-up in the business of acquiring and IPO'ing shares tied to the cash flows of professional athletes and entertainers. Before joining Fantex in 2012, Mr. Rodin served as Co-President of Glenview. Mr. Rodin started at Glenview in March 2002 and was named Director of Research in 2006 and Partner in April 2007. Prior to joining Glenview, Mr. Rodin worked in the Institutional Equity Sales Department at Goldman Sachs. Prior to his time in the

Equities Division, Mr. Rodin spent two years as a Financial Analyst in the Investment Banking Division at Goldman Sachs. Mr. Rodin graduated magna cum laude from Columbia University with a Bachelor of Arts in History in 1997. We believe that Mr. Rodin's significant investment experience make him well qualified to serve as a member of the Longview Board.

**Defendant Rothberg**

77.     Defendant Rothberg founded Butterfly in 2011 and has served as the Chair of the Board and as a Company director since the Company's founding. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Technology Committee. Previously, he served as the CEO of Legacy Butterfly from March 2014 until April 2020. Defendant Rothberg is also the founder of 4Catalyzer, a startup accelerator focusing on physics, math, and life sciences. 4Catalyzerhas launched eight companies including, AI Therapeutics, Hyperfine Research, Quantum-Si, Butterfly, and Tesseract Health. According to the 2022 Proxy Statement, as of April 1, 2022, Defendant Rothberg beneficially owned 10,011,285 Class A shares of the Company's common stock and 100% of the Company's Class B common stock, making him the controlling shareholder of the Company, with 76.3% of the total voting power of the Company. Given that the price per share of the Company's stock at the close of trading on April 1, 2022 was $4.69, Defendant Rothberg beneficially owned approximately $46,952,926 worth of Butterfly stock as of that date.

78.     For the 2021 Fiscal Year, Defendant Rothberg received $501,725 in total compensation from the Company. This included $55,534 in fees earned, $296,033 in stock awards, and $150,338 in option awards.

79.     The Company's 2022 Proxy Statement stated the following about Defendant Rothberg:

> ***Jonathan M. Rothberg, Ph.D.*** is the founder of Legacy Butterfly and served as the Chairman of our board of directors since the Closing of the Business Combination

in February 2021. Dr. Rothberg served as the Chairman of Legacy Butterfly's board of directors since March 2014. He previously served as Legacy Butterfly's Chief Executive Officer from March 2014 to April 2020, and as Legacy Butterfly's President from March 2014 to April 2014. Dr. Rothberg is a scientist and entrepreneur who was awarded the National Medal of Technology and Innovation, the nation's highest honor for technological achievement, by President Obama for inventing and commercializing high-speed DNA sequencing. Dr. Rothberg is the founder of the 4Catalyzer medical technology incubator and the founder of its companies: Legacy Butterfly, AI Therapeutics, Inc. (formerly LAM Therapeutics, Inc.), Quantum-Si Incorporated (Nasdaq:QSI), Hyperfine, Inc. (Nasdaq:HYPR), including its wholly-owned subsidiaries Hyperfine Operations, Inc. (formerly Hyperfine, Inc.) and Liminal Sciences, Inc., Tesseract Health, Inc., Detect, Inc. (formerly Homodeus Inc.) and 4Bionics LLC. These companies focus on using inflection points in medicine, such as deep learning, next-generation sequencing, and the silicon supply chain, to address global healthcare challenges. Dr. Rothberg serves as Interim Chief Executive Officer and Executive Chairman of the board of Quantum-Si Incorporated (Nasdaq:QSI) and Vice Chairman of Hyperfine, Inc. (Nasdaq:HYPR). Dr. Rothberg previously founded and served as Chairman, Chief Executive Officer, and Chief Technology Officer of Ion Torrent Systems, Inc. from 2007 to 2010, and founded and served as Chairman and Chief Executive Officer of RainDance Technologies, Inc. from 2004 to 2009. From 1999 to 2007, Dr. Rothberg co-founded and served as Chairman of ClarifI, Inc., and from 1999 to 2006, he founded and served as Chairman, Chief Executive Officer and Chief Technology Officer of 454 Life Sciences Corporation. With 454 Life Sciences, Dr. Rothberg brought to market the first new way to sequence genomes since Sanger and Gilbert won the Nobel Prize for their method in 1980. With 454's technology, Dr. Rothberg sequenced the first individual human genome, and with Svante Paabo he initiated the first large-scale effort to sequence ancient DNA (The Neanderthal Genome Project). Prior to 454 Life Sciences, Dr. Rothberg founded and served as Chairman and Chief Executive Officer of CuraGen Corporation from 1993 to 2004. His contributions to the field of genome sequencing include the first non-bacterial cloning method (cloning by limited dilution) and the first massively parallel DNA sequencing method (parallel sequencing by synthesis on a single substrate), concepts that have formed the basis for all subsequent next generation sequencing technologies. Dr. Rothberg is an Ernst and Young Entrepreneur of the Year, is the recipient of The Wall Street Journal's First Gold Medal for Innovation, SXSW Best in Show, Nature Methods First Method of the Year Award, the Connecticut Medal of Technology, the DGKL Biochemical Analysis Prize, and an Honorary Doctorate of Science from Mount Sinai. Dr. Rothberg is a member of the National Academy of Engineering, the Connecticut Academy of Science and Engineering, is a trustee of Carnegie Mellon University and an Adjunct Professor of Genetics at Yale University. Dr. Rothberg received his Ph.D., M.Phil., and M.S. in biology from Yale University and his B.S. in chemical engineering from Carnegie Mellon University. Dr. Rothberg's qualifications to serve on our board of directors include his significant scientific, executive and board leadership experience in the

technology industry, as well as his knowledge of our business as Legacy Butterfly's founder and former Chief Executive Officer.

**Defendant Schwartz**

80.     Defendant Schwartz has served as a Company director since September 2021. She also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Technology Committee.

81.     For the 2021 Fiscal Year, Defendant Schwartz received $318,044 in total compensation from the Company. This included $18,049 in fees earned and $299,995 in stock awards.

82.     The Company's 2022 Proxy Statement stated the following about Defendant Schwartz:

> ***Erica Schwartz, M.D., J.D., M.P.H.*** has served on our board of directors since September 2021. Dr. Schwartz has served as President of Insurance Solutions at United Healthcare since October 2021. Previously, Dr. Schwartz served as the Deputy Surgeon General for the U.S. Department of Health and Human Services from March 2019 to April 2021, where she led the country's public health deployment in response to the COVID-19 pandemic. Prior to her role as the Deputy Surgeon General, Dr. Schwartz spent 24 years in the uniformed service, during which time she was promoted through the ranks to Rear Admiral of the U.S. Coast Guard, where she served as the Chief Medical Officer and Director of Health, Safety, and Work Life from 2015 to 2019. Previously, Dr. Schwartz served as the U.S. Coast Guard's Chief of Health Services from 2013 to 2015 and Preventive Medicine Chief from 2005 to 2013. Dr. Schwartz has served on the board of directors of Aveanna Healthcare Holdings Inc., a provider of a broad range of pediatric and adult healthcare services, since May 2021. Dr. Schwartz is trained and board certified in Preventive Medicine. She received a Bachelor of Science degree in Biomedical Engineering from Brown University, an Medical Doctorate from Brown University School of Medicine, a Master of Public Health degree with a dual concentration in health services administration and occupational and environmental medicine from the Uniformed Services University of the Health Sciences, and a Juris Doctorate from the University of Maryland School of Law. Dr. Schwartz's qualifications to serve on our board of directors include her extensive leadership experience in healthcare and her background in medicine, biomedical engineering and law.

**Defendant Simpson**

83.     Defendant Simpson served as a director of Longview from February 2020 until the

Merger. He, along with Defendants Robbins, Rodin, Horowitz, Moore, and Cribbs, shared control

over the Sponsor.

84.     The Merger Proxy Statement stated the following about Defendant Simpson:

Randy Simpson has served on Longview's board of directors since the completion
of its initial public offering. Mr. Simpson joined Glenview in September 2005 and
was named Partner in April 2011. Mr. Simpson was a senior member of Glenview's
investment team and managed Glenview's healthcare investments through 2019.
Prior to joining Glenview, Mr. Simpson was an equity research analyst at Goldman
Sachs from 2003 until 2005, and before that, he spent three years as a generalist in
the M&A group at Credit Suisse First Boston. He received his M.B.A. in Finance
and Accounting from the University of Chicago. Mr. Simpson also earned a J.D.
from Georgetown University Law Center and a Bachelor of Arts in Quantitative
Economics and Decision Sciences from the University of California, San Diego.
Mr. Simpson served on the Board of Directors of Tenet Healthcare Corporation
(NYSE: THC) from January 2016 through August 2017. We believe that Mr.
Simpson is qualified to serve on the Longview Board due to his significant
investment experience.

***The Sponsor***

85.     The Sponsor, Longview Investors LLC, a Delaware limited liability company,

served as the sponsor of Longview leading up to the Merger and is affiliated with several of the

Individual Defendants. The Sponsor and its affiliates collectively owned over 20% of the

Company's common stock and were conflicted in the Merger given their investments in Longview

would have been rendered worthless had Longview failed to timely complete a qualifying business

combination.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

86.     By reason of their positions as controlling shareholders, officers and/or directors of

Butterfly, and because of their ability to control the business and corporate affairs of Butterfly, the

Individual Defendants owed Butterfly and its shareholders fiduciary obligations of trust, loyalty,

good faith, and due care, and were and are required to use their utmost ability to control and manage Butterfly in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Butterfly and its shareholders so as to benefit all shareholders equally.

87.     Each controlling shareholder, director and officer of the Company owes to Butterfly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

88.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors and/or officers of Butterfly, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

89.     To discharge their duties, the controlling shareholders, officers and directors of Butterfly were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

90.     Each Individual Defendant, by virtue of his or her position as a controlling shareholder, director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholders, directors and officers of Butterfly, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

91.     As controlling shareholders and senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

92.     To discharge their duties, the controlling shareholder, officers and directors of Butterfly were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Butterfly were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Massachusetts, and the United States, and pursuant to Butterfly's own Code of Business Conduct Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Butterfly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make

reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

       (d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Butterfly and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

       (e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Butterfly operations would comply with all applicable laws and Butterfly financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

       (f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

       (g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

       (h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

93.    Each of the Individual Defendants further owed to Butterfly and the shareholders the duty of loyalty requiring that each favor Butterfly interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

94.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Butterfly and were at all times acting within the course and scope of such agency.

95.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Butterfly, each of the Individual Defendants had access to adverse, non-public information about the Company.

96.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Butterfly.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

97.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

98.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

99.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually

took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Butterfly was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

100.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

101.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Butterfly, and was at all times acting within the course and scope of such agency.

## **BUTTERFLY'S CODE OF CONDUCT AND CORPORATE GOVERNANCE**

### *Code of Conduct*

102.     The Company's Code of Conduct applies to all "directors, officers and employees." The Code of Conduct's purpose is to accomplish the following:

• promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• promote the full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with, or submits to, the [SEC], as well as in other public communications made by or on behalf of the Company;

• promote compliance with applicable governmental laws, rules and regulations;

• deter wrongdoing; and

• require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

103.     The Code of Conduct provides:

It is the responsibility of each person to conduct themselves in an ethical business manner and also to ensure that others do the same. If any person violates these standards, he or she can expect a disciplinary response, up to and including termination of employment or other relationship with the Company or, potentially, legal action. If any person becomes aware of any breach of the Code, the person is obligated to report violations to the Corporate Compliance Officer, to the chairperson of the Audit Committee of the Board (the "Audit Committee") or to the Whistleblower Compliance Hotline that the Company has engaged to receive such reports[.]

104.     The Code of Conduct provides, as to honest and ethical conduct, that each officer and director shall:

• act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or when in the Company's interests;

• observe all applicable governmental laws, rules and regulations;

• comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data;

• adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices;

• refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice; and

• protect the assets of the Company and ensure their proper use.

105.     The Code of Conduct provides, as to public disclosures, that:

The Company strives to ensure that the contents of and the disclosures in the reports and documents that the Company files with the SEC and other public communications shall be full, fair, accurate, timely and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate.

Each person must:

• not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent registered public accountants, governmental regulators, self regulating organizations and other governmental officials, as appropriate; and

 • in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer…and Chief Financial Officer…and each subsidiary of the Company (or persons performing similar functions), and each other person who typically is involved in the financial reporting of the Company, must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company. Each person must promptly bring to the attention of the Chairperson any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls that could adversely affect the Company's ability to record, process, summarize and report financial data or (b) any fraud that involves management or other employees who have a significant role in the Company's financial reporting, disclosures or internal controls.

106.    The Code of Conduct provides the following as to record keeping:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must both conform to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation.

Records should always be retained or destroyed according to the Company's record retention policies. In accordance with those policies, in the event of litigation or governmental investigation, please consult the Board or the Company's internal or external legal counsel.

107.    The Code of Conduct provides, as to other executive officer responsibilities:

• Act with honesty and integrity, avoiding actual or apparent conflicts between personal, private interests and the interests of the Company, including receiving improper personal benefits as a result of his or her position.

• Disclose to the CEO (if a senior financial officer) and the Board any material transaction or relationship that reasonably could be expected to give rise to a conflict of interest.

• Perform responsibilities with a view to causing periodic reports and documents filed with or submitted to the SEC and all other public communications made by the Company to contain information that is accurate, complete, fair, objective, relevant, timely and understandable, including full review of all annual and quarterly reports.

• Comply with laws, rules and regulations of federal, state and local governments applicable to the Company and with the rules and regulations of private and public regulatory agencies having jurisdiction over the Company.

• Act in good faith, responsibly, with due care, competence and diligence, without misrepresenting or omitting material facts or allowing independent judgment to be compromised or subordinated.

***Audit Committee Charter***

108.    Butterfly's Audit Committee Charter (the "Audit Committee Charter") defines the responsibilities of the Company's Audit Committee.

109.    The Audit Committee Charter lists, among the Audit Committee's responsibilities, the following, in relevant part:

• Oversee the Company's enterprise risk management process and help the full Board understand the Company's material enterprise risks and contingencies. The Committee will discuss with management, and the independent auditor to the extent applicable, the Company's policies with respect to enterprise risk assessment and risk management, including the Company's significant financial and enterprise risk exposures and the actions management has taken to limit, monitor or control such exposures.

• Discuss guidelines and policies governing the process by which senior management of the Company assess and manage the Company's exposure to risk, as well as the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

• Meet periodically with outside counsel when appropriate, to review legal and regulatory matters, including (i) any matters that may have a material impact on the financial statements of the Company and (ii) any matters involving potential or ongoing material violations of law or breaches of fiduciary duty by the Company or any of its directors, officers, employees, or agents or breaches of fiduciary duty to the Company;

• Prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement;

• Review the Company's program to monitor compliance with the Company's Code of Business Conduct and Ethics, and meet periodically with the Company's Compliance Committee to discuss compliance with the Code of Business Conduct and Ethics;

• Review with management and the independent auditors the results of the year-end audit of the Company and the Company's annual financial statements and Form 10- K, including any comments or recommendations of the independent auditors, prior to the release of earnings and, based on such review and discussions and on such other considerations as it determines appropriate, recommend to the Board whether the Company's financial statements should be included in the Annual Report on Form 10-K;

• Review with management and the independent auditor each Form 10-Q prior to its filing or prior to the release of earnings, including a discussion with the independent auditor of the matters required to be discussed under Statements of Auditing Standards; Case 1:22-cv-00825-MN Document 1 Filed 06/21/22 Page 14 of 62 PageID #: 14 15

• Review the type and presentation of information to be included in the Company's earnings press releases (especially the use of "pro forma" or "adjusted" information not prepared in compliance with generally accepted accounting principles), as well as financial information and earnings guidance provided by the Company to analysts and rating agencies for each completed fiscal period prior to their release; and

• Review and, where appropriate, make recommendations to the Board regarding: capital expenditure budgets and proposed capital expenditure projects that may have a material impact on the Company's financial position; policies relating to the Company's liquidity requirements, including cash flow, cash management and investments.

110.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Company records and

reports, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report known violations of the Code of Conduct and law.

111.    Moreover, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

#### *Background of Longview*

112.    Longview was incorporated in Delaware on February 4, 2020, as a special purpose acquisition company (i.e., a SPAC) formed for the purpose of effecting a merger, capital stock exchange, or similar business combination with one or more businesses. It was managed by the Sponsor, Longview Investors LLC, which was jointly controlled by Defendants Robbins, Rodin, Horowitz, Moore, Cribbs, and Simpson.

113.    Longview's Registration Statement filed with the SEC and declared effective on May 20, 2020, represented to investors that Longview was sponsored by Glenview. Specifically, the Registration Statement provided that "Glenview seeks to invest [] in companies that it believes to be undervalued" and that "Glenview's investment team conducts substantial business, financial and legal due diligence on every investment before acquiring a meaningful ownership stake[.]"

114.    Initially, as noted in its draft registration statement filed with the SEC on November 27, 2020, Longview's stated business targets were companies in the healthcare technology industries. Indeed, the Longview Defendants held themselves out to investors as highly experienced in the technology and finance industries, which they repeatedly stated would be Longview's focus for completing a merger.

115.    Prior to Longview's IPO, the Sponsor purchased an aggregate of 8,625,000 Founder Shares. In April 2020, the Sponsor transferred 25,000 of the Founder Shares to each of Defendants Moore, Cribbs, and Simpson, who served as three of Longview's directors.

116.    On May 20, 2020, Longview effected a stock dividend with respect to its Class B common stock, resulting in the Sponsor holding an aggregate of 10,275,000 Founder Shares with 10,350,000 Founder Shares outstanding, thereby ensuring that the Sponsor would retain approximately 20% of the total issued and outstanding shares of Longview upon the consummation of Longview's IPO. Through the issuance of the Founder Shares, the Sponsor, and by their joint control of the Sponsor, Defendants Robbins, Rodin, Moore, Cribbs, and Simpson, collectively owned approximately 20% of Longview's issued and outstanding shares of common stock as of the date of the Merger Proxy Statement. The Merger Proxy Statement reported that each of Defendants Robbins, Rodin, Moore, Cribbs, and Simpson may be deemed the beneficial owner of the Founder Shares held by the Sponsor.

117.     On May 26, 2020, Longview closed its IPO, selling 36,000,000 units at $10.00 per unit. On June 9, 2020, Longview sold an additional 4,000,000 units to the underwriters upon the underwriters' election to partially exercise their over-allotment option, and on June 26, 2020, in connection with the underwriters' election to exercise their remaining over-allotment option, Longview sold an additional 1,400,000 units to the underwriters, for a total offering size of 41,400,000 units and generating gross proceeds of $414,000,000. In addition, Longview issued units to the Sponsor in a private placement that occurred simultaneously with the closing of the IPO. Specifically, the Sponsor purchased an aggregate of 6,853,333 Private Placement Warrants at a price of $1.50 per private placement warrant, for a purchase price of $10,280,000.

118.     Following the closing of Longview's IPO, $414,000,000 of the net proceeds generated from the IPO and simultaneous private placement were placed in the Trust and these funds were to be released only upon the closing of a qualifying business combination, or in the case of liquidation to return the funds to Longview's investors. The Trust was established to safeguard two key rights held by Longview shareholders under Longview's Charter: (1) the right to redeem their shares at $10.00 per share price instead of investing in the business combination; and (2) in the event Longview was unable to timely complete the business combination, the right to receive a return of all IPO proceeds.

**The Overpayment Misconduct**

***Background on Legacy Butterfly and the Company's Products***

119.     Legacy Butterfly, founded by Defendant Rothberg in 2011, is a digital health company which sells ultrasound devices that turn complex ultrasound processes into one connected portable system to "help offer better, more efficient care." The Company's mission is to "enable universal access to superior medical imaging, making high-quality ultrasound

affordable, easy-to-use, globally accessible, and intelligently connected using its patented Ultrasound-on-Chip™ semiconductor technology." Butterfly owns several subsidiaries internationally, with locations in Australia, Germany, the Netherlands, the United Kingdom, and Taiwan.

120.   In contrast to traditional ultrasound machines, which use piezoelectric crystals to produce images, Butterfly's use microchips.  During the Relevant Period, the Company had two primary products, the Butterfly iQ, a hand-held and single-probe whole body ultrasound system; and the Butterfly iQ+, a point-of-care ultrasound imaging device that connects with a smart phone or tablet. Butterfly no longer sells the Butterfly iQ.

121.   Unlike traditional ultrasound imaging probes that rely upon piezoelectric crystals, the Butterfly iQ probes use microchips, which Butterfly refers to as its "Ultrasound-on-Chip" technology. The purported benefit of using microchips rather than piezoelectric crystals is that microchips purportedly could, if manufactured at scale, significantly reduce the production costs of ultrasound imaging devices.

122.   Near the end of 2018, Legacy Butterfly debuted its first commercial product, the iQ. The iQ is a handheld ultrasound probe which connects to a smartphone or tablet that displays the ultrasound images created by the device. The smartphone or tablet also displays a user interface that the user can interact with to change the device's settings.

123.   Debuting at $2,000, the iQ was advertised as much cheaper than traditional cart-based ultrasound machines, which retail for as high as $60,000. The iQ was much cheaper than other handheld devices on the market, as they generally sold for prices between $5,000 and $7,000.

124.   Two years after iQ's debut, in October 2020, Legacy Butterfly launched the iQ+. Although the iQ+ and iQ generally look the same, the iQ+ is slightly shorter and has a 15% smaller

probe head. The iQ+ operates in the same way as the first-generation iQ, but better battery life, higher framerates, and increases in continuous run time.

125.    Despite reaching the market with a higher price tag than the iQ, discounts at the time of product debut kept prices around $2,000 per probe. Indeed, through the first nine months of 2020, the average product revenue per unit sold and shipped was approximately $2,055.

126.    Before the Merger, Legacy Butterfly represented that it would be introducing new products across the coming years. The below image was included in an investor presentation that was filed with the SEC on November 20, 2020 and was later included in the Registration Statement itself:



127.    However, between the fourth quarter of 2018 and the third quarter of 2020, Legacy Butterfly sold less than 27,000 probes in total. Additionally, Legacy Butterfly was not selling more products as the Merger approached, but instead was selling a consistently low number of products across the entirety of the time frame. This was largely because Legacy Butterfly's products were still in their infancy- they needed to be further developed and were not ripe enough to be widely depended on by Enterprise Customers.

128.    Butterfly also sells software subscriptions with its devices to purportedly give users HIPAA compliant cloud storage and artificial intelligence-assisted ultrasound imaging. Butterfly sells its software through monthly or yearly subscriptions. These subscriptions can cost $420 per year, per user. Cloud software storage is important for Enterprise Customers, as data storage of this kind is necessary for properly billing health insurance companies.

129.    Before the Merger, and in the Merger Proxy Statement, Butterfly represented that the Company's software was "fully integrated into the clinical workflow" and was a "complete solution" for point of care medical imaging.

130.    However, this was not the case. The Company's software was not ready for the market, and instead was only in its early development stage.

131.    The Securities Class Action interviewed five separate employees of Legacy Butterfly and Butterfly, all of whom corroborated these circumstances, among other things.

132.    For example, CW-3 worked as a Senior Finance Planning & Analysis Manager from June 2021 until November 2021. As a Senior Finance Planning & Analysis Manager, CW-3 was responsible for long-term forecast modeling. According to CW-3, when they began employment in June 2021, Butterfly had only begun early-stage software development, that the software was in a proof-of-concept stage even after the Merger, and that the software itself did not have the functional capabilities that Enterprise Customers needed. For this reason, Enterprise Customers were not interested in using Butterfly probes because they did not have the functional capabilities that were needed for proper use. Additionally, CW-3 stated that many Enterprise Customers, such as doctors, physicians, and other practitioners did not need the Company's full software solution because they already knew how to use the probes. Since Butterfly required a

recurring annual subscription with every probe sale, Butterfly's customers would often not renew their software subscriptions after the initial one-year subscription had concluded.

133.    Butterfly uses third-party sellers across China, Taiwan, and Thailand for parts for the manufacturing of the Company's probes. Originally, Butterfly bought custom made microchips from Silex, a developmental lab in Sweden. However, the Company subsequently changed to Taiwan Semiconductor Manufacturing Company Limited ("TSMC") for the manufacturing of the Company's microchips. Benchmark Electronics, Inc., located in Thailand, make, test, and ship Butterfly's probes.

134.    Since the microchips are highly specialized, TSMC required Butterfly to purchase certain amounts of inventory based upon the Company's "sales forecasts":

> The Company enters into inventory purchase commitments with third-party manufacturers in the ordinary course of business. These commitments are generally non-cancellable and are based on sales forecasts. These agreements range from one to five-year periods and may contain fixed or minimum annual commitments, subject to certain provisions that allow the Company to renegotiate the commitment. The aggregate amount of minimum inventory purchase commitments as of December 31, 2019 was $36.4 million, which excludes the prepaid vendor advance described below.

135.    Additionally, these contracts were "non-cancellable" and required the Company to pay in advance. For instance, the TSMC agreement from March 31, 2019 contained in the Merger Proxy Statement (the "TSMC Agreement") stated the following:

> During 2019, the Company entered into an agreement with a certain third party manufacturing vendor. Under the agreement, during the year ended December 31, 2019, the Company made a prepayment to the vendor for certain inventory commitments of approximately $56.4 million, which is recorded as a vendor advance.
>
> * * *
>
> In August 2020 the Company and the vendor qualified the manufacturing process specified in the agreement and the Company began purchasing product from the vendor. As a result, the Company has accrued a $56.4 million liability under the agreement as of September 30, 2020. In the fourth quarter of 2020, the Company and the vendor amended the agreement to include provisions to increase the

aggregate purchase commitments to $169.0 million and extend the time frame of the agreement.

136.    For example, the TSMC Agreement required "Wafer consumption obligations"[2]

that required Butterfly to make purchase orders for certain amounts of inventory, and that Butterfly

had to pay even if Butterfly did not need to place another purchase order:

> [***] TSMC [***] use commercially reasonable efforts to [***] have ready [***] wafers for Customer, [***] wafers for [***]. Additionally, for [***], Customer shall [***]. In the [***], TSMC will [***]. ***Customer will also commit to consume all the raw wafers purchased by TSMC [***]. If Customer does not consume the raw wafers purchased by TSMC, Customer shall reimburse TSMC for the unused raw wafers.*** For [***], TSMC and Customer will follow the arrangements set forth in Exhibit A herein (i.e. the [***]) where Customer will purchase from TSMC any unused raw wafers.
>
> In light of the [***], ***Customer shall, [***], consume [***] (i.e. consuming [***] wafers [***], which is [***] wafers [***]). For example, if [***], Customer shall [***] be required to order from TSMC [***].*** TSMC and Customer will work together to develop a mutually agreeable qualification plan for the qualification of TSMC manufacturing process, and the qualification plan shall include certain acceptance criteria requested by Customer, which is also to be mutually agreed upon between TSMC and Customer (the "Customer Acceptance Criteria"). The TSMC manufacturing process will become a [***] when [***].
>                                    ***
> ***In the event Customer fails to fulfill its [***] Wafer consumption requirement from above by not placing purchase orders in accordance with TSMC's lead-time, on a [***] basis and on the [***] when the applicable purchase order is to be issued by Customer, TSMC shall have the right to deduct, from money already paid by Customer to TSMC***, a monetary amount that is [***]. By deducting the said monetary amount, TSMC will [***]. For example, if Customer plans to consume [***] Wafers in [***] (which [***]), TSMC shall have the right [***] to deduct a monetary amount (from money Customer already paid to TSMC) that is [***]. Customer's [***] of [***] under [***] (i.e. the [***]) is [***]. After TSMC has deducted the [***].

 (Emphasis added.)

---

[2] In this context, "wafers" are parts of a semiconductor, like crystalline silicon, that are used in the manufacture of integrated circuits and microchips. They are integral to Butterfly's products.

137.    Even further, while the TSMC Agreement mandated that Butterfly buy certain amounts of parts, the TSMC Agreement only provided that TSMC had to use "commercially reasonable efforts" in furnishing the wafers to Butterfly on the anticipated schedules, thereby affording much more flexibility to TSMC than Butterfly received.

138.    Similarly, another contract entered into between Legacy Butterfly and Benchmark Electronics, Inc. (the "Benchmark Agreement") on October 1, 2015 required that Butterfly buy certain amounts of component parts regardless of whether the Company actually needed them to meet demand for its probes. These agreements led to Butterfly having to take large write-offs for obsolete inventory throughout the Relevant Period. Compounding this issue was the fact that Butterfly was completely dependent on multiple suppliers to timely deliver component parts for probe assembly, which exposed Butterfly to risk that delays by one supplier that required the Company to buy component parts from another supplier would result in excess inventory for Butterfly.

139.    In another instance, according to CW-1, who worked as Head of Global Supply Chain from July 2019 until August 2020, TSMC was supposed to begin manufacturing the Company's microchips by August 2019, but did not begin production until late 2020. The Merger Proxy Statement corroborated CW-1's account:

> During 2019, the Company entered into an agreement with a certain third party manufacturing vendor. Under the agreement, as September 30, 2020 [sic], the Company has a prepaid vendor advance, net of write-downs of approximately $46.9 million. In August 2020, the Company and the vendor qualified the manufacturing process specified in the agreement and the Company began purchasing product from the vendor. During the year ended September 30, 2020, the Company recognized a net of loss on the vendor purchase commitment of $56.4 million, recorded as a current liability. []
>
> In the fourth quarter of 2020, the Company and the vendor amended the inventory supply arrangement. The amended agreement included provisions to increase the

aggregate purchase commitments to $169 million and extend the time frame of the agreement.

140.   CW-1 stated that Butterfly was told by TSMC for months that TSMC would begin microchip production soon. However, as time passed, Butterfly had to engage Swedish lab Silex to provide the microchips in a timely fashion to meet Butterfly's anticipated demand. Butterfly had to do this despite being still on the hook for its previous purchase commitments in the TSMC Agreement, even though TSMC did not timely provide the microchip component parts to Butterfly.

141.   Unfortunately for Butterfly, TSMC belatedly produced the microchips and required Butterfly to pay for them, despite Butterfly not having a need for them. Indeed, according to CW-1, the Company's former CEO, Laurent Faracci,[3] in March or April 2020, tried to recoup Butterfly's advance payment to TSMC, but TSMC would not refund the payment and instead told Butterfly that Butterfly would still have to comply with minimum wafer purchase requirements in the TSMC Agreement. When TSMC finally started to manufacture the microchips in September 2020, Butterfly had already bought microchips from Silex but nonetheless was forced to purchase certain amounts of microchips from TSMC anyway. In an effort to save money, Butterfly tried to negotiate its microchip purchase commitments, as explained in the Merger Proxy Statement:

> *Other Purchase Commitments*
>
> In September 2020, the Company has renegotiated certain inventory purchase commitments with other third party manufacturing vendors and as a result certain inventory purchase commitments have been cancelled. As a result of the renegotiations, ***the Company has accrued the expected losses on those commitments of $7.6 million*** in the September 2020 financial statements.

(Emphasis added.)

---

[3] Laurent Faracci was the Company's CEO from March 2020 until January 23, 2021. He abruptly departed the Company just three days before the Individual Defendants filed the Merger Proxy Statement with the SEC.

142.    The TSMC Agreement, amended in August 2020, extended the time for Butterfly to make its microchip purchase commitments to December 2022. However, the amended deal doubled Butterfly's minimum purchase quota, from $80.3 million to $169 million, which was more than 6x the Company's 2019 annual sales and more than twice the Company's aggregate sales for both 2019 and 2020 combined.  The Merger Proxy Statement neglected to inform investors that Butterfly had to purchase $169 million of microchip inventory from TSMC by December 2022.

143.    However, Legacy Butterfly was not able to cultivate enough market demand to sell the high amount of inventory the Company had, notwithstanding the inventory Legacy Butterfly was required to purchase by December 2022. For example, CW-4, who worked as Director of Sales – South from July 2019 until April 2022, stated that TSMC required the Company to "purchase a ton of chips" that Butterfly never even used. In result, in 2019, the Company wrote-down $5.3 million of inventory and recorded purchase commitment losses of $9.5 million pertaining to the third-party supply contracts for inventory that could not be sold. During the first nine months of 2020, the Company had to increase the write-downs to $6.9 million and $64 million.

### *Butterfly's Early Sales Strategy Emphasizes E-Commerce and Individual Practitioners*

144.    When Butterfly debuted the iQ, the Company's first ultrasound product, Butterfly sold the iQ primarily directly to consumers who were "early adopters" like individual practitioners. Enterprise Customers, such as hospitals, were not interested in the iQ because the technology was largely new and therefore did not enjoy a long history of positive performance or wide acceptance. CW-4 stated that the Company's sales in 2019 and 2020 were largely from "early adopters" like individual practitioners. Indeed, former Butterfly President Gioel Molinari stated in a June 24, 2020 interview posted on YouTube that Butterfly was "focus[ed] on capturing the lower, the early

adopter market" and conceded that the Company had not "cross[ed] the chasm"[4] from early adopter to widespread user, stating: "We've been really, really good at capturing tens of thousands of early adopters [], however, we still have to really make this mainstream." Molinari also stated that Butterfly did not yet "prove[d] out the last elements of impact" necessary to "bring the product to the masses."

145.    Indeed, after the Merger and into 2022, Butterfly's sales to Enterprise Customers were lagging. CW-5, who worked as a Strategic Account Director at Butterfly from February 2021 until November 2022, stated that in 2021 and 2022, Butterfly was not selling many products to Enterprise Customers, and was depending on e-commerce sales to "keep the lights on."

146.    For instance, in 2019 and 2020, before the Merger, Legacy Butterfly sold and shipped approximately 12,900 devices and 20,200 devices, respectively, generating total revenues of $27.6 million in 2019 and $46.3 million in 2020. In 2021, Butterfly's product sales increased to 23,800 products, a year over year increase of just 17.8%. The Company's software sales made up a small fraction of the Company's total sales; Butterfly's software subscription sales in 2019 and 2020 were $2.5 million and $7.9 million, respectively, constituting just 9.1% of the Company's sales in 2019 and 17.1% in 2020.

147.    Vitally, since Butterfly did not establish a sales team focused on Enterprise Customers until long after the Merger, either in late 2021 or early 2022, almost all of Legacy

[4] Geoffrey A. Moore's 1991 book, *Crossing the Chasm: Marketing and Selling High-Tech Products to Mainstream Customers*, discusses the concept of an adoption gap between early and mainstream markets in the selling of new technological products. He argues that companies selling a new product should focus on building a small customer base of visionaries (early adopters) and then later focus on a wider market. According to Moore, the most difficult thing for the business to do is to cross the "chasm" from early adopters to a wider audience.

Butterfly's sales were to "early adopters' such as individual practitioners who bought the Company's products online without sales representatives.

***Butterfly Shifts Sales Strategy From E-Commerce and Individual Practitioners to Large Enterprise Customers to Meet the Exaggerated 2021 Financial Forecasts in the Merger Documents Despite Not Having the Sales Team Nor Technology in Place to Support It***

148.    At the time of the Merger, Butterfly was not capable of selling large amounts of products because of weak demand from e-commerce and early adopter customers. CW-4 stated that the demand from these groups was not enough to sell the amount of inventory that Butterfly had purchased or committed to purchase in the future. For this reason, Butterfly publicly pivoted to emphasizing sales to Enterprise Customers before the Merger. According to CW-4, this was the only way Butterfly could claim such robust sales forecasts, and that Butterfly could not come close to reaching the figures in the 2021 Financial Forecasts had Butterfly remained solely focused on early adopters and individual practitioners.

149.    Enterprise Customers, which constitute large health care providers such as hospitals, are generally not amenable to purchasing and using new technology unless it has all the features needed and is proven to work well. CW-3 noted that shortly after the Merger, iQ and iQ+ remained in early development and were lacking functionality and certain desired features. For instance, CW-3 remembered that Butterfly was still working on tutorials with nurse practitioners on how to use the devices for lung scans and was trying to get "more options" for how the probes could be used during pregnancy. Likewise, CW-2 stated that when they started at Butterfly in May 2021, the devices were not ready for "prime time." CW-4 confirmed that when Butterfly abruptly pivoted to Enterprise Customers, the Company was not capable of meeting Enterprise Customers' requirements and only began adding these features in the latter half of 2021. For instance, CW-4 stated that Butterfly's system did not work with Electronic Healthcare Records ("EHR"), could

not make reports, did not conduct "QR" scoring, and did not meet other "work flow" requirements of Enterprise Customers. CW-5 corroborated CW-2's, CW-3's, and CW-4's experiences, stating that when CW-5 left Butterfly in November 2022, the Company was "still building" the software and that that experience was like "building a plane as we flew it."

150.    In addition to the still-in-development software problem, Butterfly did not have a viable sales team at the time of the Merger that had the expertise to identify Enterprise Customer needs to promote Butterfly's products. Indeed, per CW-4, Legacy Butterfly did not even have a team to design a sales team for Enterprise Customers, and only designed one after Defendant Fruchterman and Pugh "came onto the scene" in early 2021. Defendant Fruchterman came on as CEO and President on February 1, 2021 and Chief Commercial Officer Pugh came an entire month after the Merger. The press release that announced Pugh's onboarding specifically mentioned a "**newly created executive position**" that would "oversee the **development** and implementation of **Butterfly's commercial strategy**." (Emphasis added). CW-2 and CW-3 corroborated CW-4's recollections, stating that when they joined the Company after the Merger, Butterfly did not have any large Enterprise Customers.

151.    Butterfly began trying to bring in Enterprise Customers almost a year after the Merger, in either late 2021 or early 2022, per CW-5. At that time, Butterfly "bought" a "flagship account." The flagship account was the University of Rochester Medical Center ("URMC"). Butterfly's deal with URMC involved Butterfly charging URMC **only $1,000 per probe** while also providing the software complimentary—**free of charge**—since Butterfly was searching for a premier account to deploy for promotional purposes in the hope of bringing in future Enterprise Customers. As part of the deal, the probes would be fully implemented within 90 days. Despite this, when CW-5 departed Butterfly even with the huge pricing concessions Butterfly made to

URMC and the Company's representation that the implementation of the probes at URMC would be completed within 90 days, the implementation of the probes at URMC remained incomplete in November 2022, approximately six to eight months after the deal was made.

### Butterfly Provides Patently Unreasonable 2021 Financial Forecasts to Shareholders, Investors, and the Public Before, During, and After the Merger

152.    The Individual Defendants caused the Company to include in the Merger Proxy Statement the 2021 Financial Forecasts, which were extremely inflated by a minimum of at least 20%, as they were calculated using a growth strategy that depended upon the Company selling products to Enterprise Customers and were, therefore, patently unrealistic. Butterfly could never attain the 2021 Financial Forecasts because the Company's ultrasound probes were not fully developed for Enterprise Customer consumption and because the forecasted margins were impossible to attain due to the Company's large component part purchase obligations that exceeded market demand.

153.    The CWs corroborated the unachievable nature of the 2021 Financial Forecasts. CW-3 called the forecasts a "pie-in-the-sky" that were only compiled for investor consumption and that no one inside the Company seriously considered. CW-3 further stated that the 2021 Financial Forecasts were not based upon historical sales growth rates, any deals that were in the Company's future, or whether the Company actually had a sales team dedicated to Enterprise Customers. Rather, according to CW-3, the 2021 Financial Forecasts were based on an assumed growth rate dependent upon "more penetration in enterprise" that the Company could not reach, partly due to the fact that the Company had not even hired an executive to build an Enterprise Customer sales team until after the Merger. Similarly, CW-2 stated the 2021 Financial Forecasts were "completely ridiculous" and "out of whack" since they did not consider the Company's actual pipeline of deals. Likewise, CW-5 stated that "we all knew" that the 2021 Financial Forecasts were

"unattainable," and that most of the Company's sale team made only approximately 40% of their goals for 2021, which was 30 to 40% less than what CW-5 saw while working at other companies. CW-5 also stated that the sales goals "came from the top down" and were not based on important metrics that are usually used, such as considering a salesperson's geographic location, previous sales, and current opportunities in the location.

154.    CW-4 stated that the sales quotas for 2021 set for Butterfly's sales representatives were "way too high" and that CW-4 hadn't reached even half of their sales quota at any time in 2021 and that no other salesperson came close to hitting their quotas.

155.    CW-2, CW-3, CW-4, and CW-5 all stated that Butterfly kept track of future sales and potential sales opportunities in the Company's Salesforce.com software system. CW 3 further stated that before using Salesforce.com, Butterfly used Google Drive spreadsheets. CW-2 stated that the sales leads in the Salesforce.com system did not support the 2021 Financial Forecasts either and that in any event, the entries in the Salesforce.com system were not accurate anyway, since employees were sometimes instructed to re-label dates of old potential deals that had not been pursued to make it appear that the deal was still viable. On other occasions, Salesforce.com entries would exaggerate the number of ultrasound probes a potential customer was considering buying. For example, CW-2 remembered that they spoke to the City of Miami Fire and Rescue Department and that the Department was considering purchasing three probes, but the Salesforce.com system stated that the Department wanted 66 probes.

156.    Even further, CW-2 stated that even if a sale had been made, not one customer during CW-2's employment with Butterfly had an "absolute implementation." Therefore, throughout CW 2's employment, CW-2 could not point to a single Enterprise Customer that had actually purchased, installed and implemented the probes into their business. Even worse, CW-2

noted that after digging into the deals on the Saleforce.com system that appeared to be almost completed, almost half of them were "all fluff" and just "smoke and mirrors" and would have to be removed. CW-4 corroborated CW-2's assessment that potential deals listed in the Saleforce.com system were exaggerated, with CW-4 remembering that a potential deal with Atrium was listed at 700 probes, but when the deal actually was consummated in mid-2021 it was only for approximately 70 probes.

157.    CW-5 maintained that the sales team was told that the sales goals were based on "the pipeline in Salesforce," but the pipeline was riddled with "either fake or not qualified opportunities" and CW 5 had no idea "where [Butterfly] got the goals from." CW 5 stated that this caused few salespeople to attain their annual sales goals and had an impact on the high turnover of the sales team. CW-5 personally remembered a potential $1.4 million software deal with New York University ("NYU") that was included in CW-5's pipeline of deals on the Salesforce.com system. However, when CW-5 contacted NYU, NYU stated that it had "no interest" in a software deal with Butterfly. CW-5 stated that Butterfly had another deal with NYU in the past that involved Butterfly supplying an "incomplete" and "an abbreviated version" of what NYU had wanted. This left NYU with "a bad taste" that resulted in NYU telling CW-5 to "pound sand." Despite NYU's clear intention to not contract with Butterfly, CW-5 was informed to keep the potential deal in the Safesforce.com pipeline. CW-5 stated that there were many other deals like this in the Company's pipeline. However, CW-5 maintained that even if one included all of the fraudulent listings in Butterfly's pipeline, the numbers would still not cover the astronomical 2021 Financial Forecasts.

158.    Proceeding with the Merger proved costly in numerous ways, including by exposing Longview, the Sponsor, and certain of the other Defendants to multiple lawsuits. Moreover, since the closing of the Merger, the Company's shareholders automatically lost most

of the $10 per share they put into the Trust without considering the value destruction caused by Butterfly's lack of viable technology. Given their conflicts of interest, the Company's Board failed to adequately inform shareholders about their prospects post-Merger, including that redeeming their shares would be a better idea.

159.    During the Relevant Period, the Individual Defendants made and/or caused the Company to make to the investing public a series of materially false and misleading statements regarding the business, operations, and prospects of the Company and Legacy Butterfly. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) the Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**False and Misleading Statements**

***November 30, 2020 Merger Proxy Statement***

160.    On November 30, 2020, the Company filed the Merger Proxy Statement with the SEC in connection with the Merger. The Merger Proxy Statement was solicited by Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel pursuant to Section 14(a) of the Exchange Act. Defendants Rothberg also signed the Merger Proxy Statement, which contained materially misleading elements.

161.    The Merger Proxy Statement requested Company shareholders to vote to, *inter alia*: (1) approve the Merger; (2) approve six separate proposals to amend  Longview's Amended and Restated Certificate Incorporation; (3) elect Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel as directors; (4) approve a proposal for the PIPE financing; and (5) approve a proposal to adopt  the Incentive Plan (collectively, the "Merger Proposals").

162.    The purpose of the Incentive Plan was to "enhance [the Company's] ability to attract, retain and motivate persons who make (or are expected to make) important contributions to [the Company] by providing these individuals with equity ownership opportunities, and to encourage profitability and growth through short-term and long-term incentives that are consistent with [the Company's] objectives." If approved by shareholders, the Incentive Plan would have allowed for approximately 11% of the outstanding shares of post-Merger Company stock to be available for issuance as compensation to the Company's officers and directors, including various of the Individual Defendants.[5]

---

[5] The Merger Proxy Statement notes that "[t]he Plan provides for the future issuance of shares of New Butterfly common stock, representing 11% of the number of shares of New Butterfly common stock outstanding following the Business Combination less 2,602,954 shares plus: (i) the number of shares of Butterfly common stock that remain unallocated and available for grant at the Closing of the Business Combination under the Butterfly 2012 Employee, Director and Consultant Equity Incentive Plan multiplied by 1.0383 or that are forfeited, expire or are canceled without issuance under the Butterfly 2012 Equity Incentive Plan following the Closing, and (ii) an annual increase on the first day of each fiscal year during the period beginning with fiscal year 2021 and ending on the second day of fiscal year 2030, equal to the lesser of (a) 4% of the number of

163.     Pursuant to the Incentive Plan, awards may be granted until the tenth anniversary of the Incentive Plan's effective date, which is November 19, 2029, unless either the Board or one of the committees it delegates terminates the Incentive Plan before then. Further, the Incentive Plan includes an annual limit for each non-employee director's total compensation. Under the Incentive Plan, the grant date fair value of shares of common stock subject to any award granted to a non-employee director in any calendar year may not exceed $1,000,000. The Company's officers and directors have received and continue to receive lucrative compensation, while numerous of them made false and misleading statements, during and after the solicitation of the Merger Proxy Statement. These officers and directors would not have received this lucrative compensation pursuant to the Incentive Plan had certain of them made false and misleading statements in the Merger Proxy Statement, as the shareholders would not have approved the Merger, and thus, the Incentive Plan, had they known the truth about Butterfly. In total to date, the Company has paid over $37 million (detailed in the chart below) to its officers and directors pursuant to the Incentive Plan as a result of shareholders approving the Incentive Plan under false pretenses.

164.     The Merger Proxy Statement represented that Butterfly's software is fully integrated:

> Powered by Butterfly's proprietary Ultrasound-on-Chip™ technology, **Butterfly's solution addresses the needs of point of care imaging with a unique combination of software and hardware technology**. Butterfly iQ, followed by Butterfly's recently launched Butterfly iQ+, is Butterfly's first product powered by Butterfly's Ultrasound-on-Chip™, and is the only ultrasound transducer that can perform "whole-body imaging" in a single handheld probe using semiconductor technology. Butterfly's Ultrasound-on-Chip™ reduces the cost of manufacturing, while **Butterfly's software is** intended to make the product easy to use and **fully**

---

outstanding shares of New Butterfly common stock on such date, and (b) an amount determined by the plan administrator."

***integrated with the clinical workflow***, accessible on a user's smartphone, tablet, and almost any hospital computer system connected to the Internet.[6]

165.    The Merger Proxy Statement stated the following about Butterfly's software's

ability to integrate seamlessly into large healthcare systems:

> With its interoperability, image transfer / storage, and mobility / remote-monitoring capabilities, our solution can integrate seamlessly into large health care systems, simplifying the enterprise workflow for scanning and increasing the effectiveness of the imaging ecosystem within the enterprise. This has helped us to build extensive relationships and with sales to or agreements with most of the top 100 U.S. healthcare systems, leading to many of our large volume enterprise (direct) sales.

166.    The Merger Proxy Statement stated the following about Butterfly's software's

ability to be a "solution" to "governance and workflow challenges":

> We continue to enhance our software to further integrate our solution with health systems to simplify workflow and governance of their imaging ecosystem. ***Our unique ability to connect and govern traditional third party ultrasound systems gives enterprise customers a solution to the governance and workflow challenges that have limited the utilization and billing of point of care imaging devices.***

167.    The Merger Proxy Statement stated the following about Butterfly's software

benefitting Enterprise Customers:

> Enterprise customers deploying Butterfly's solution benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems and connects directly with customers' electronic medical records ("EMRs").

168.    The Merger Proxy Statement also stated the following about Butterfly's software

benefitting Enterprise Customers:

> By adopting Butterfly Enterprise software, customers can responsibly manage and drive maximum value from their fleets of point of care imaging devices.

---

[6] All emphasis is added unless otherwise noted.

169.    The Merger Proxy Statement stated the following about Butterfly's ability to "provide a complete solution" via its ultrasound probes and accompanying software:

Products & Services

***Butterfly provides a complete solution to address an unmet need in point-of-care medical imaging through a unique combination of hardware and software services***. Our hardware is powered by the first and only currently available ultrasound on a semiconductor chip. ***Our software addresses the traditional ease-of-use challenges and the complex clinical workflow throughout a patient's care pre-and post-examination. Our integrated system with EMRs*** provides healthcare practitioners with a tool that enables fast and confident clinical decision-making.

170.    The Merger Proxy Statement contained the following about the capabilities of the Company's "Software Services":



171.    The Merger Proxy Statement stated the following about Butterfly's software's ability to be HIPAA compliant via its cloud storage system:

In addition to social impact, we believe our solution will also have significant clinical impact. ***Through our software solution, empowered by AI, users can upload scanned images to our HIPAA compliant cloud, which has unlimited storage, links to hospital and office systems, and can be accessed from a desktop computer. This allows practitioners to access and transfer their scanned images in a seamless and secure way, leading to additional opportunities for observation***

and therefore, we believe, earlier diagnosis and treatment. Furthermore, our solution delivers billing codes directly in the user interface application following scanning, both enhancing practitioner compliance adherence and increasing revenue in fee-for-scan environments.

172.     The Merger Proxy Statement additionally made a similar representation later in the

document:

> *Through our software subscription options, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage and links to hospital and office systems, allowing for seamless transfer of images that can also be accessed from a desktop computer.* As telemedicine continues to make headway through our healthcare system, our software application features TeleGuidance, which is the world's first integrated ultrasound telemedicine platform.

173.     The Merger Proxy Statement included the following 2021 Financial Forecasts:

| | 2020 | 2021 | 2022 | 2023 | 2024 |
|---|---|---|---|---|---|
| Revenue ($ in millions) | $44.0 | $78.1 | $137.9 | $235.2 | $334.0 |
| % Year over year revenue growth | 60% | 77% | 77% | 71% | 42% |
| % gross margin | NM | 43% | 51% | 60% | 68% |
| Contribution from wearables | — | — | — | 5% | 10% |

174.     The Merger Proxy Statement represented that the aforementioned 2021 Financial

Forecasts were management's "reasonable estimates and assumptions" for Butterfly's "expected

future financial performance:"

> *The Projections were prepared in good faith by Butterfly's management based on their reasonable estimates and assumptions with respect to the expected future financial performance of Butterfly at the time the Projections were prepared and speak only as of that time….*

175.     The Merger Proxy Statement further stated the following about the 2021 Financial

Forecasts:

> *The accompanying prospective financial information [], in the view of Butterfly's management, was prepared on a reasonable basis, reflects the best currently available estimates and judgments, and presents, to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Butterfly.*

176.     The Merger Proxy Statement stated the following about the risks associated with

the possibility of future weak demand for the Company's products:

> If Butterfly does not successfully optimize and operate its sales and distribution
> channels or Butterfly does not effectively expand and update infrastructure, its
> operating results and customer experience may be negatively impacted.
>
> **If Butterfly does not adequately predict market demand or otherwise optimize and
> operate its sales and distribution channels successfully, it could result in excess
> or insufficient inventory or fulfillment capacity, increased costs, or immediate
> shortages in product or component supply, or harm Butterfly's business in other
> ways.** In addition, if Butterfly does not maintain adequate infrastructure to enable
> it to, among other things, manage its purchasing and inventory, it could negatively
> impact Butterfly's operating results and user experience.

177.     The Merger Proxy Statement stated the following about the Company's prospects

regarding the possibility of having to write-down certain assets:

> **Subsequent to the consummation of the Business Combination, we may be
> required to take write-downs or write-offs, restructuring and impairment or other
> charges** that could have a significant negative effect on our financial condition,
> results of operations and stock price, which could cause you to lose some or all of
> your investment.
>
> Although Longview has conducted due diligence on Butterfly and New Butterfly,
> Longview cannot assure you that this diligence revealed all material issues that may
> be present in its business, that it would be possible to uncover all material issues
> through a customary amount of due diligence, or that factors outside of Longview's
> or New Butterfly's control will not later arise. As a result, **New Butterfly may incur
> additional costs and expenses and may be forced to later write-down or write-off
> assets, restructure its operations or incur impairment or other charges that could
> result in losses**. Even if the due diligence successfully identifies certain risks,
> unexpected risks may arise and previously known risks may materialize in a manner
> not consistent with our preliminary risk analysis. Even though these charges may
> be non-cash items and not have an immediate impact on our liquidity, the fact that
> New Butterfly reports charges of this nature could contribute to negative market
> perceptions about New Butterfly or its securities.

178.     The Merger Proxy Statement stated the following about the potentiality of the

Company's products becoming "non-competitive or obsolete":

> **Medical device development is costly and involves continual technological
> change, which may render Butterfly's current or future products obsolete.** The

market for point-of-care medical devices is characterized by rapid technological change, medical advances and evolving industry standards. ***Any one of these factors could reduce the demand for Butterfly's devices or services or require substantial resources and expenditures for research, design and development to avoid technological or market obsolescence.***

[…]

Butterfly might have insufficient financial resources to improve existing devices, advance technologies and develop new devices at competitive prices. ***Technological advances by one or more competitors or future entrants into the field may result in Butterfly's current devices becoming non-competitive or obsolete, which may decrease revenues and profits and adversely affect Butterfly's business and results of operations.***

179.    The Merger Proxy Statement included the Investor Presentation from November 20, 2020 that stated that "Healthcare Institutions to Drive Adoption at Scale: Strong initial adoption, excitement, and momentum" and "Butterfly has an existing footprint in most of the Top 100 US Health System." These Investor Presentation included the following slide addressing this point:





180.    The Investor Presentation also stated that "Near term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets."

181.    The Investor Presentation also stated that Butterfly anticipated revenues of $78.1

million in 2021:



182.    The Merger Proxy Statement also represented that the following reasons supported

Longview's board of directors' decision to enter the Merger Agreement and recommend the

Merger with Legacy Butterfly:

- historical information regarding Butterfly's business, financial performance, and results of operations;

- current information and forecast projections from Butterfly and Longview's management regarding (i) Butterfly's business, prospects, financial condition, operations, technology, products, services, management, competitive position, and strategic business goals and objectives, (ii) general economic, industry, and financial market conditions and (iii) opportunities and competitive factors within Butterfly's industry;

- Butterfly's ability to demonstrate the value of its technology to existing and potential users and its ability to integrate into and add value to large healthcare enterprise systems;

183. The statements in ¶¶ 162-182 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

184. Regarding the due diligence the Longview board took with respect to investigating Legacy Butterfly prior to the completion of the Merger, the Merger Proxy Statement also represented the following:

> In analyzing the Business Combination, the Longview Board and management conducted due diligence on Butterfly and researched the industry in which Butterfly operates. The Longview Board reviewed, among other things, financial due diligence materials prepared by Longview management and professional advisors, including trading multiples and other valuation metrics for comparable companies, market opportunity studies conducted by an independent consulting firm engaged to assess the size and scope of the market for Butterfly's products, Butterfly's financial projections and the various factors that may cause the company to miss or exceed its projections and the financial terms set forth in the Business Combination

Agreement, and concluded that the Business Combination was in the best interest of its stockholders.

185.     The Merger Proxy Statement stated that "during the course of Longview management's evaluation of Butterfly's operating business and its public company potential, management conducted detailed due diligence on certain potential challenges" including:

- competition in the marketplace for handheld ultrasound devices and Butterfly's product pipeline;

- the ability of Butterfly to sell into large enterprises and the associated integration challenges within that market;

- the fact that some key executives only recently joined Butterfly and the ability of Butterfly to adequately staff for the needs of a public company on the relevant timeline; and

- the ability of Butterfly to meet its financial projections and other financial and operating metrics.

186.     The statements referenced in ¶¶ 184-185 above were materially false and misleading because Longview misrepresented its due diligence efforts of Legacy Butterfly by exaggerating that it had conducted proper due diligence of Legacy Butterfly prior to completion of the Merger. In reality, Legacy Butterfly was a company without an industry-altering ultrasound device that boasted full solution software for large Enterprise Customers. Instead, Legacy Butterfly was just at the beginning of developing its software and did not have a single Enterprise Customer at the time of the Merger Proxy Statement. Making matters worse, Legacy Butterfly also engaged in fraudulent conduct such as exaggerating the Company's potential sales pipeline by littering it with potential deals that that the Company never expected to complete, all in an effort to artificially boost the 2021 Financial Forecasts.

187.     The Merger Proxy Statement also misrepresented the value of Longview shares leading up to the Merger by representing that each Longview share was worth $10.00. The Merger

Proxy Statement represented to investors that the aggregate value of the consideration to be paid by Longview in the Merger was approximately $4 billion through the issuance of approximately 414,00,000 shares of "New Butterfly" common stock issued by Longview valued at $10.00 per share.

188.    The Merger Proxy Statement also described certain Longview related party transactions concerning the Founder Shares and Private Placement Warrants, stating the following, in relevant part:

> In connection with the closing of our initial public offering, we consummated the sale of 6,853,333 private placement warrants at a price of $1.50 per warrant in a private placement to our Sponsor. The warrants are each exercisable commencing the later of 30 days following the Closing and 12 months from the closing of our initial public offering, which occurred on May 26, 2020, for one share of Longview Class A common stock at $11.50 per share. If we do not consummate a business combination transaction by May 26, 2022, then the proceeds from the sale of the private placement warrants will be part of the liquidating distribution to the public stockholders and the warrants held by our Sponsor will be worthless. The warrants held by our Sponsor had an aggregate market value of approximately $6.85 million based upon the closing price of $1.00 per warrant on the NYSE on November 19, 2020. Upon the Closing, the private placement warrants will become 6,853,333 warrants to purchase shares of New Butterfly Class A common stock at an exercise price of $11.50 per share.

189.    The statements referenced in ¶¶ 187-188 above were materially false and misleading because Longview failed to disclose that the entire Longview board had deep financial ties to the Founder Shares. Even Defendants Cribbs and Simpson, whom Longview represented to be independent directors, each held 25,000 Founder Shares, which would net each of them $250,000 if the Merger was successfully effectuated before Longview's deadline to effectuate a business combination. Because Longview's board consisted entirely of directors who had conflicts of interest relating to the Founder Shares, Longview's board could not form a special committee consisting of truly disinterested and independent directors to evaluate the fairness of the Merger.

190.    The Merger Proxy Statement explicitly maintained that Longview's board unanimously supported the Merger and found that the transactions solicited in the Merger Proxy Statement were in "the best interests" of Longview and its stockholders. The Longview board unabashedly recommended that shareholders approve the transactions contemplated in the Merger Proxy Statement.

191.    The misrepresentations and omissions set forth herein were material to shareholders in voting on the Merger Proposals who would not have approved the Merger Proposals had they been informed about the Overpayment Misconduct and the true state of affairs at the Company and Legacy Butterfly.

192.    Due to the false and misleading elements of the Merger Proxy Statement, Company shareholders voted to: (i) approve the Merger; (ii) elect Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel to Butterfly's Board, allowing them to make false and misleading statements; (iii) approve the NYSE Proposal; and (iv) approve the Incentive Plan, which thereafter allowed various of the Individual Defendants to materially benefit from the false and misleading statements contained in the Merger Proxy Statement.

193.    Given the lack of appropriate and accurate disclosures in the Merger Proxy Statement, Longview shareholders were unable to evaluate what they would receive in connection with any investment in the post-Merger Company. As many would come to know, those that failed to redeem their shares were duped into investing in a Company with little to no value.

***January 12, 2021 J.P. Morgan Healthcare Conference Webcast***

194.    On January 12, 2021, Butterfly presented at the J.P. Morgan Healthcare Conference Webcast via webcast. The presentation utilized a slide presentation that was filed with the SEC that same day. The presentation included slides that stated that: (i) Butterfly had "strong initial

adoption" and "momentum" with healthcare institutions; (ii) Butterfly experienced ""Near-term growth supported by executing pipeline bookings across the enterprise and e-Commerce markets;" and Butterfly was anticipating $78.1 million in revenue for the 2021 Fiscal Year.

195.    The presentation included the following slide that emphasized Butterfly's ability to "drive adoption at scale" with "healthcare institutions" and that the Company has an "existing footprint in most of the Top 100 US Health Systems":



196.    The slide presentation also stated that Butterfly's "near term growth [is] supported by executing pipeline bookings across the enterprise and e-Commerce markets."

197.    The slide presentation also included a slide that stated Butterfly's anticipated revenues would be $78.1 million for 2021 with gross margins of 43%:



198.   The slide presentation also stated that Butterfly's "software services," at that point in time, had several capabilities such as "Enterprise Workflow" that would be attractive to Enterprise Customers:



**March 29, 2021 Form 10-K**

199.     On March 29, 2021, the Company filed its annual report for the year ended December 31, 2020 on Form 10-K with the SEC (the "2020 10-K"). The 2020 10-K was signed by Defendants Fruchterman, Robbins, Rothberg, Carfora, Edelman, Hammergren, Pettiti, and Phanstiel and contained certifications, signed by Defendant Fruchterman, pursuant to Rules 13a-14(a) and 15d-14(a) promulgated under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of the financial statements contained in the 2020 10-K, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

200.     The 2020 10-K stated the following about Butterfly's hardware and software performance:

> We are an innovative digital health business with a mission of democratizing healthcare by making medical imaging accessible to everyone around the world. Powered by our proprietary Ultrasound-on-Chip™ technology, **our solution addresses the needs of point of care imaging with a unique combination of software and hardware technology**. Butterfly iQ, followed by our recently launched Butterfly iQ+, is our first product powered by Butterfly's Ultrasound-on-Chip™, and is the only ultrasound transducer that can perform "whole-body imaging" in a single handheld probe using semiconductor technology. Our Ultrasound-on-Chip™ reduces the cost of manufacturing, while **our software is […] fully integrated with the clinical workflow**, accessible on a user's smartphone, tablet, and almost any hospital computer system connected to the Internet. Through our portable proprietary, handheld solution, protected by a robust intellectual property portfolio and empowered in part by its proprietary software and Artificial Intelligence ("AI"), Butterfly aims to enable earlier detection throughout the body and remote management of health conditions around the world.

201.     The 2020 10-K stated the following about Butterfly's ability to benefit Enterprise Customers through its ultrasound devices:

> We are working towards increasingly integrated solutions to maximize our value to large healthcare customers, as well as continuing to improve our sales and support infrastructure. **Our ability to connect and govern traditional third party ultrasound systems gives enterprise customers a solution to the governance and**

***workflow challenges that have limited the utilization and billing of point of care imaging devices.***

202.   The 2020 10-K represented that Enterprise Customers would benefit from a "streamlined clinical workflow" should they use Butterfly's software solution:

> ***Enterprise customers deploying our solution can benefit from a streamlined clinical workflow that reduces the exam documentation burden typically associated with traditional ultrasound systems.***

203.   The 2020 10-K also stated that "***By adopting Butterfly Enterprise software, customers can responsibly manage and optimize value from their fleets of point of care imaging devices.***"

204.   The 2020 10-K also stated that Butterfly's "Software Services," at the time of the filing of the 2020 10-K, included "Enterprise Workflow" features that would be highly beneficial to Enterprise Customers:



205.   The 2020 10-K also stated that Butterfly's software allowed hospitals and office systems to "access and transfer…scanned images in a seamless and secure way":

In addition to social impact, we believe our solution will also have significant clinical impact. ***Through our software solution, empowered by AI, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage, links to hospital and office systems, and can be accessed from a desktop computer. This allows practitioners to access and transfer their scanned images in a seamless and secure way, leading to additional opportunities for observation*** and therefore, we believe, earlier diagnosis and treatment. Furthermore, our solution delivers billing codes directly in the user interface application following scanning, both enhancing practitioner compliance adherence and increasing revenue in fee-for-scan environments.

206.   Later in the 2020 10-K, the Individual Defendants caused the Company to make a substantially similar statement:

> ***Through our software subscription options, users can upload scanned images to our HIPAA-compliant cloud, which has unlimited storage and links to hospital and office systems, allowing for seamless transfer of images that can also be accessed from a desktop computer.*** As telemedicine continues to make headway through our healthcare system, our software application features TeleGuidance, which is the world's first integrated ultrasound telemedicine platform.

207.   The 2020 10-K also stated the following about the potentiality of excess inventory in the future:

> *If we do not successfully optimize and operate our sales and distribution channels or we do not effectively expand and update infrastructure, our operating results and customer experience may be negatively impacted.*

> ***If we do not adequately predict market demand or otherwise optimize and operate our sales and distribution channels successfully, this could result in excess or insufficient inventory or fulfillment capacity, increased costs, or immediate shortages in product or component supply, or harm our business in other ways***. In addition, if we do not maintain adequate infrastructure to enable us to, among other things, manage our purchasing and inventory, this could negatively impact our operating results and user experience.

208.   The 2020 10-K also stated the following about the potentiality of Butterfly's products becoming obsolete in the future:

> ***Medical device development is costly and involves continual technological change, which may render our current or future products obsolete.***

The market for point-of-care medical devices is characterized by rapid technological change, medical advances and evolving industry standards. *Any one of these factors could reduce the demand for our devices or services or require substantial resources and expenditures for research, design and development to avoid technological or market obsolescence.*

[…]

We might have insufficient financial resources to improve existing devices, advance technologies and develop new devices at competitive prices. *Technological advances by one or more competitors or future entrants into the field may result in our current devices becoming non-competitive or obsolete, which may decrease revenues and profits and adversely affect our business and results of operations.*

**March 29, 2021 Earnings Conference Call**

209.    On March 29, 2021, Butterfly held an earnings conference call with investors and analysts to discuss the Company's fourth quarter of 2020 and full year of 2020 financial results. During the call, an analyst asked a question regarding Butterfly "rapidly scaling up" its Enterprise Customers. Defendant Fruchterman responded by stating that there was "strong demand" for Butterfly's ultrasound probes and the total solution software:

> So thanks for the question. We absolutely -- one of the things in me coming in right now as a new CEO and taking a look at the opportunities that we have as Butterfly is to challenge all the opportunities that we have in our business model. And enterprise is an area that we're definitely excited about. ***There's strong demand in enterprise right now for Butterfly, not only as a unique ultrasound device, but for our total solution too***. Our sales force expansion is on track there. We continue to -- we're continuing to drive that expansion to help us take advantage of the opportunity in enterprise. We're focused also on customer success to help usability and deployment of the solutions. ***And we're lining up to enterprise. So we see a lot of opportunities in the enterprise channel, not just using point-of-care ultrasound, but also the ability to deploy our Butterfly solution across the enterprise*** and get maximum value out of the information.

**May 13, 2021 Earnings Conference Call**

210.    On May 13, 2021, Butterfly held an earnings conference call with investors and analysts to discuss the Company's first quarter of 2021 financial results. During the call, the

Individual Defendants reaffirmed the 2021 Financial Forecasts. Specifically, Defendant Fruchterman stated the following:

> And while we intend to continuously refine our longer term strategy, *we are excited about the demand in the marketplace today, and are pleased to reaffirm revenue guidance* and provide additional transparency for 2021. Stephanie will walk through our guidance details later in the call.

211.    Defendant Fielding also stated during the call that "*For the full year 2021, total revenue is projected to be approximately $76 million to $80 million, or 64% to 73% growth year-over-year*."

212.    During the call, the Individual Defendants also caused the Company to display the following slide that depicted some of the 2021 Financial Forecasts:



| Metric | Guidance Range |
| --- | --- |
| Revenue | $76mm – $80mm |
| Revenue Growth | 64% – 73% |
| Gross Margin | 43% – 47% |
| Adjusted Gross Margin | 42% – 46% |
| Net Loss | ($135mm) – ($155mm) |
| Adjusted EBITDA | ($140mm) – ($160mm) |

213.    The statements in ¶¶ 194-212 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and

therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Begins to Emerge as False and Misleading Statements Continue

*May 13, 2021 Press Release*

214.    That same day, Butterfly issued a press release that announced the Company's first quarter of 2021 financial results. The press release included the 2021 Financial Forecasts, stating that "Revenue is expected to be approximately $76 million to $80 million, or approximately 64% to 73% growth year-over-year" and "Gross margin is expected to be approximately 43% to 47%. Adjusted gross margin is expected to be approximately 42% to 46%."

215.    However, the press release revealed that that Butterfly's inventory balance had rose by more than $10 million, or about 40% in only three months.

216.    On this news, the Company's share price dropped $1.78 per share, from a closing price of $11.23 per share on May 12, 2021 to close at a price of $9.45 per share on May 13, 2021.

*August 9, 2021 Earnings Conference Call*

217.     On August 9, 2021, held an earnings conference call with investors and analysts to discuss the Company's second quarter of 2021 financial results. During the call, the Individual Defendants discussed the Company's products and sales pipeline. Specifically, Butterfly's CFO stated the following:

> Despite some of these challenges, we remain on track with important momentum and interest from a wide range of customers. As we continue to execute our commercial strategies, there may still be some variability in the timing of deals in our pipeline over the next quarters.
>
> ***That said, we believe we have a strong pipeline and demand for our solution across the breadth of use cases afforded by our team, and still see our annual performance shaping up to be in the guidance range we've provided in Q1[.]***

218.     During the earnings conference call, the Individual Defendants utilized a slide presentation that reaffirmed the 2021 Financial Forecasts:



219.     The statements in ¶¶ 217-218 above were materially false and misleading and failed to disclose the facts necessary to make the statements made not materially false and misleading. Specifically, they failed to disclose that: (1) the Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless

of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

### May 27, 2021 Motley Fool Article

220. On May 27, 2021, Motley Fool published an article titled "Wall Street Flies Away from Butterfly Networks after its Second Earnings Report," which stated that the Company's inventory had grown to "almost as much as its total revenue:"

> This $2-billion-market-cap company also noted that it had inventory at the end of the quarter worth $36.1 million, up $10.3 million from the end of Q4. Given that it increased its inventory by almost as much as its total revenue for the quarter, management is apparently really banking on sales to accelerate in the second half of the year.

### November 15, 2021 Press Release

221. On November 15, 2021, Butterly published its third quarter of 2021 financial results, which revealed that Butterfly faced a $11.6 million loss from purchase commitments and would also have to significantly reduce its 2021 Financial Forecast by $18 million, or 23%:

> • Revenue is expected to be approximately $60 million to $62 million, or approximately 30% to 34% growth year-over-year.
>
> • Gross margin is expected to be approximately 28% to 30%. Adjusted gross margin is expected to be approximately 48% to 50%.

• Net loss is expected to be approximately $(65) million to $(75) million. Adjusted EBITDA loss is expected to be approximately $(125) million to $(135) million.

### *November 15, 2021 Earnings Conference Call*

222.    That same day, Butterfly held an earnings conference call with analysts and investors to discuss the Company's third quarter of 2021 financial results. During the call, Defendant Fruchterman admitted:

[B]ased upon our most recent experiences and the current health care environment, we must reset expectations for revenue for the balance of the year. While our revenues for Q3 grew 44% year-over-year, *we are falling short of what's necessary to achieve the annual guidance provided by prior management 1 year ago and reaffirmed by me in May* of this year with the information I had, having just joined the company. For 2021, we now expect full year revenue growth in the range of 30% to 34%. This represents good progress in our current commercial activities and mounting user enthusiasm about Butterfly, but is offset by health care logistical challenges and doctor, nurse and medical technician fatigue concurrent with COVID conditions and its broad consequences.

223.    Defendant Fruchterman went on:

It's important to note that there has been a significant management evolution since projections were first made that included an aggressive back half 2021 ramp. While we have rapidly reoriented strategy team and the company overall to adjust to the need to shift from a direct-to-user-led market approach to a more integrated commercial approach to health systems and specialties.

224.    Later, Defendant Fielding supported Defendant Fruchterman's comments about Butterfly falling short on its financial projections:

Third quarter revenues grew 44% year-over-year to $14.6 million, and adjusted gross margin came in at 49.3%. While these numbers are healthy, they did fall short for the back half ramp that is necessary to meet our original revenue projections.

225.    Defendant Fielding also admitted that Butterfly's $11.6 million loss on purchase commitments was due to "reserve on inventory that we may not be able to use." She went on to say the following:

[I]nventory in the third quarter was $23.8 million, a $23.1 million decrease from the $46.9 million reported in the second quarter of 2021. This decrease was due to

a balance sheet reclassification from our purchase commitment liability. As we have continued upgrading our product to increase reliability and position us for future transformational technology, we have determined that older raw material is likely obsolete. Consequently, we reclassified $35 million of that older raw material from reserve against the inventory to a reduction in inventory.

226.     Importantly, Defendant Fielding also admitted that Enterprise Customers were not buying Butterfly's ultrasound probes as quickly as the Company had represented they would:

In light of the themes Todd discussed earlier on the call, including the backdrop of COVID on health care, which is delay of system implementations in institutions, a longer sales and development cycle related to health systems adoption and the trends we are seeing in direct-to-user purchases, we are adjusting our 2021 guidance to reflect our views on the current pace of market adoption. For the full year 2021, total revenue is projected to be approximately $60 million to $62 million or 30% to 34% growth year-over-year. . . .

227.     On this news, the Company's share price dropped $1.08 per share, or 13%, from a closing price of $8.60 per share on November 12, 2021 to close at a price of $7.52 per share on November 15, 2021.

### *February 28, 2022 Press Release*

228.     On February 28, 2022, Butterfly issued a press release that "introduced" Butterfly Blueprint, the Company's new software. The press release depicted the software as "a system-wide platform designed to support the scaled deployment of ultrasound across hospitals and health systems[.]" The press release further stated that Butterfly Blueprint "brings hospitals and health systems a complete ultrasound solution" and "[b]y integrating into health systems' clinical and administrative systems and workflows, Blueprint delivers a clinical assessment tool at scale." The press release's description of Butterly Blueprint was substantially the same description of the software that Butterfly already allegedly had before and during the Merger.

### *February 28, 2022 Earnings Conference Call*

229.    That same day, Butterfly held an earnings conference call with investors and analysts to discuss the Company's fourth quarter of 2021 financial performance. During the call, Defendant Fruchterman stated that Butterfly had partnered with a third-party company that provided a significant amount of the "digital plumbing" and "infrastructure" of the software:

> And so we made a lot of investment and aggregated a lot of the components of what we put together in Butterfly and Butterfly Blueprint in '21. So Butterfly Blueprint is really the road map for us moving forward in health systems. []

> Our partnership with Ambra was kind of an innovative approach to helping us move Blueprint and Compass on top of an architecture and some, I guess, you think about it as digital plumbing as a way for us to accelerate to move up and to think progressively about how to get more relevant and scale faster. So we were able to work with them, collaborate and then kind of put Compass and essentially the Blueprint solution on top of some of their infrastructure that they have established being one of the leaders in cloud-based medical imaging management.

230.    Also, during the call, Defendant Fruchterman stated that Butterfly's newly minted partnership with URMC would be used "to really prove the embodiment of our strategy, which is the practical application of ultrasound information into the clinical workflow." Defendant Fruchterman elaborated:

> And so part of this whole [URMC] deployment was both looking at how do we measure and how do we learn together on what it takes to get people confident? How do you deploy this into workflows? What is best practice to learn and evolve to do that? How do we get information around that? How do we look at evolving, improving the clinical care pathways and then the returns and the economic benefits of doing that?

231.    He went on:

> But right now, what we're focused on, most importantly, is evolving [Butterfly's Compass software] to make sure that it can be scalable and deployed across other institutions, the efforts that it takes and the efficiencies that we can drive in getting people up to scale for the deployment and then seeing the incorporation into the workflows and then starting to measure the benefits. So we see this first year as a growing and learning and deploying year.

***February 28, 2022 UBS Analyst Report***

232.    Analysts and investors were disappointed with this news; UBS published a report that same day which stated that "[in January 2022], BFLY announced its first enterprise wide deployment" and that "BFLY noted it could see another 1-2 large institutional deployments this year," meaning that the Company had only one Enterprise Customer that was scheduled to begin use of Butterfly probes during the 2022 Fiscal Year. The UBS report concluded that "Net-net, BFLY is making some significant progress on its business model, but we see risk as it looks to drive a shift in care delivery, which we view as a heavy lift and valuation gives us pause." UBS also reduced its target price for Butterfly to $5.50 per share, which was significantly less than the previous mark of $7.00.

233.    On this news, the Company's share price dropped $0.56 per share, or 9.8%, from a closing price of $5.71 per share on February 27, 2022 to close at a price of $5.15 per share on February 28, 2022.

### May 2, 2022 Proxy Statement

234.    On May 2, 2022, the Company filed the 2022 Proxy Statement with the SEC. Defendants Fruchterman, Fielding, Rothberg, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

235.    The 2022 Proxy Statement called for Company shareholders to vote to, *inter alia*: (1) elect Defendants Fruchterman, Fielding, Rothberg, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz to the Board; (2) ratify the appointment of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; (3) approve, on a advisory basis, the Company's named executive officer compensation; and (4)

approve, on an advisory basis, the frequency of future advisory votes to approve the Company's

named executive officer compensation.

236.    With respect to the Company's Code of Conduct, the 2022 Proxy Statement stated:

We have adopted a code of business conduct and ethics that applies to all of our directors, officers and employees, including our principal executive officer, principal financial officer and principal accounting officer. The text of the code of business conduct and ethics is posted on our website at www.butterflynetwork.com and will be made available to stockholders without charge, upon request, in writing to the Corporate Secretary at Butterfly Network, Inc., 530 Old Whitfield Street, Guilford, Connecticut 06437. Disclosure regarding any amendments to, or waivers from, provisions of the code of business conduct and ethics that apply to our directors, principal executive officer and principal financial officer will be included in a Current Report on Form 8-K within four business days following the date of the amendment or waiver, unless website posting or the issuance of a press release of such amendments or waivers is then permitted by the rules of the NYSE.

237.    Regarding the "Role of Board in Risk Oversight," the 2022 Proxy Statement stated:

The board of directors have extensive involvement in the oversight of risk management related to the Company and its business and accomplishes this oversight through the regular reporting to the board of directors by the audit committee. The audit committee periodically reviews the Company's accounting, reporting and financial practices, including the integrity of its financial statements, the surveillance of administrative and financial controls and its compliance with legal and regulatory requirements. Through its regular meetings with management, including the finance, legal, internal audit and information technology functions, the audit committee reviews and discusses all significant areas of our business and summarizes for the board of directors areas of risk and the appropriate mitigating factors. In addition, the board of directors receives periodic detailed operating performance reviews from management.

238.    The 2022 Proxy Statement was materially false and misleading because, despite

assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the

Individual Defendants (1) making and/or causing the Company to make the numerous false and

misleading statements and omissions alleged herein; and (2) failing to report violations of the Code

of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because,

despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

239. The 2022 Proxy Statement also failed to disclose, *inter alia*, that: (1) The Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) the Individual Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

240. As a result of Defendants Fruchterman, Fielding, Rothberg, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia,* to re-elect Defendants Fruchterman, Fielding, Rothberg, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz to the Board, thus allowing them to continue breaching their fiduciary duties to the Company.

## The Truth Fully Emerges

241. On November 3, 2022, Defendant Fruchterman spoke during a call about Butterfly's software and its inability to integrate with enterprise workflows:

Some of our initial learnings in the market, however, made us recognize that we were not where we needed to be in order to realize the full value of our technology and the impact to healthcare. So we went to work on our enterprise level software and workflow solutions. We have spent the last year investing heavily in the development of our software solutions Blueprint and Compass. Significant progress and software development has created best-in-class image management and workflow software across ultrasound platforms, both internal and external to Butterfly. As a result, we have gone from software that was objectively lagging to software that is now highly valued and we continue to innovate and push it beyond the status quo. Based on what we're learning from our customers, we know that software is the enterprise enabler. We are proud that enterprise level software development has now become a positive differentiator for Butterfly.

242.     Also, during the call, Defendant Fruchterman discussed delays in implementations, low revenues, and a downward adjustment to annual revenue guidance:

[L]eading people through behavior change takes time both in practice and implementation, but just as others are experiencing within the industry, the budgeting and workforce pressures have intensified resulting in implementation delays. Some of our future partners are simply delaying implementation and commitments until they can catch up on people.[]

[Revenue] is lower than our internal expectations due to increased challenges at the macro level. [T]he broader macro environment is waging a toll on health systems. The environment has placed additional demand on frontline healthcare workers and management that has pushed out their inevitable innovation in the very near-term. The impact of this environment, it's causing a delay in our growth and as a result, we are adjusting our guidance to $73 million to $76 million[.]

243.     Later in November 2022, Oppenheimer & Co. analysts stated that "Butterfly is currently undergoing an evolution of its commercial strategy, which began in 2021." Oppenheimer & Co.:

New management team is trying to implement a new business strategy in terms of product positioning, sharpening the value proposition message, improving product attributes, etc. This essentially means the story is in transition[.]

244.     On this news, the Company's share price dropped $0.85 per share, or 17.7%, from a closing price of $4.79 per share on November 2, 2022 to close at a price of $3.94 per share on November 3, 2022.

**DAMAGES TO BUTTERFLY**

245.     As a direct and proximate result of the Individual Defendants' conduct, Butterfly will lose and expend many millions of dollars.

246.     Such losses include overpayment made by the Company in consideration of the Merger.

247.     Such losses include compensation paid to Defendants pursuant to the Incentive Plan.

248.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

249.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

250.     Such expenditures also include, but are not limited to, amounts paid to outside lawyers, accountants, and investigators in connection thereto, and losses of revenues caused by customers' loss of trust in the Company's business and products.

251.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

252.     As a direct and proximate result of the Individual Defendants' conduct, Butterfly has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

253.     Plaintiffs bring this action derivatively and for the benefit of Butterfly to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Butterfly, unjust enrichment, gross mismanagement, waste of corporate assets, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 11(f) of the Securities Act and 21D of the Exchange Act.

254.     Butterfly is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

255.     Plaintiffs are, and have been at all relevant times, shareholders of Butterfly. Plaintiffs will adequately and fairly represent the interests of Butterfly in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

256.     Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

257.     A pre-suit demand on the Board of Butterfly is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following eight individuals: Defendants Rothberg, Robbins, Carfora, Edelman, Pettiti, Phanstiel, and Schwartz (the "Director Defendants") and non-party Joseph DeVivo. Plaintiffs need only to allege demand futility as to four of the eight Directors who are on the Board at the time this action is commenced.

258.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to cause the Company to engage in the Overpayment Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

259.    Demand is also excused as to the Director-Defendants because pursuant to the Merger Proxy Statement, shareholders were asked to approve their future compensation through approving the Incentive Plan, which reserved shares of the Company's common stock to be used in the future for, among other things, the benefit of the Director-Defendants. These financial incentives have precluded the Director-Defendants from acting in the best interests of the shareholders, as they have failed to correct the false and misleading statements and omissions contained in the Merger Proxy Statement, the solicitation of which they materially benefitted from since it resulted in their election as Company directors and shareholder approval of the Incentive Plan.

260.    To date, Defendants Fruchterman, Rothberg, Carfora, Edelman, Hammergren, Pettiti, Robbins, and Schwartz have received material personal benefits under the Incentive Plan as a result of the Director-Defendants' solicitation of the false and misleading Merger Proxy Statement which called for shareholder approval of the Incentive Plan. Shareholders would not have approved the Incentive Plan had they known the true state of affairs at the Company or at Legacy Butterfly. As a result of shareholder approval of the Incentive Plan, Defendants Rothberg, Carfora, Hammergren, Phanstiel, and Pettiti each received $446,371 worth of stock awards during

the 2021 Fiscal Year and Defendants Carfora, Edelman, Hammergren, Pettiti, Phanstiel, Robbins, and Schwartz each received $149,998 worth of stock awards during the 2022 Fiscal Year from the Company pursuant to the Incentive Plan; they will receive stock awards while they remain as directors. As a result, Defendants Rothberg, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, Robbins, and Schwartz are beholden to the Longview Defendants (who solicited the Merger Proxy Statement), and the Director-Defendants (currently sitting on the Board) are beholden to each other, and, thus, cannot be presumed to be disinterested in taking action to redress the misconduct alleged herein. As such, demand upon Director-Defendants Rothberg, Robbins, Carfora, Edelman, Pettiti, Phanstiel, and Schwartz is futile and, therefore, excused.

261.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Butterfly to issue materially false and misleading statements. Specifically, the Director-Defendants caused Butterfly to issue false and misleading statements which were intended to make Butterfly appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

262.    Additional reasons that demand on Defendant Rothberg is futile follow. Defendant Rothberg founded Legacy Butterfly in 2011. He has served as the Chair of the Board and as a Company director since the Company's founding. He also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Technology Committee. Previously, he served as the CEO of Legacy Butterfly from March 2014 until April 2020. As the Company's Chair of the Board throughout the Relevant Period, Defendant Rothberg was

ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he signed in the Merger Proxy Statement. He also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendants Fruchterman, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz, which allowed them to continue making false and misleading statements. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Rothberg with his principal occupation for which he receives handsome compensation including over $500,000 during the 2021 Fiscal Year following the Merger. As the Company's former highest officer and co-founder, Defendant Rothberg conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Rothberg owns 76.3% of the total outstanding stock of the Company, making him the Company's controlling shareholder. Moreover, Defendant Rothberg is a defendant in the Securities Class Action. For these reasons, Defendant Rothberg faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

263.    Additional reasons that demand on Defendant Robbins is futile follow. Defendant Robbins has served as a Company director since February 2020.  He also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee. Previously, he was Longview's Chair of the Board from Longview's founding until the Merger. Defendant Robbins was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant

Period, including those which he signed in the Merger Proxy Statement. As the CEO and Portfolio Manager of Glenview, he oversaw the creation of Longview and facilitated the Merger. He also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendants Fruchterman, Rothberg, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Robbins, including over $442,000 during the 2021 Fiscal Year following the Merger. Defendant Robbins conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Robbins is a defendant in the Securities Class Action. For these reasons, Defendant Robbins faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

264.    Additional reasons that demand on Defendant Carfora is futile follow. Defendant Carfora has served as a Company director since February 2021. She also serves as a member of the Compensation Committee. Defendant Carfora was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which she solicited in the Merger Proxy Statement. She also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of herself and Defendants Fruchterman, Rothberg, Robbins, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Carfora, including over $446,000 during the 2021 Fiscal Year following the Merger. Defendant Carfora conducted

little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Carfora faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

265. Additional reasons that demand on Defendant Edelman is futile follow. Defendant Edelman has served as a Company director since March 2021. He also serves as a member of the Technology Committee. He also serves as an advisor to Tesseract Health, a company founded by Defendant Rothberg. Defendant Edelman was ultimately responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period. He also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendants Fruchterman, Rothberg, Carfora, Robbins, Hammergren, Pettiti, Phanstiel, and Schwartz, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Edelman, including over $450,000 during the 2021 Fiscal Year following the Merger. Defendant Edelman conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Edelman faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

266. Additional reasons that demand on Defendant Pettiti is futile follow. Defendant Pettiti has served as a Company director since February 2021. He also serves as the Chair of the Compensation Committee and as a member of the Audit Committee. Defendant Pettiti was

ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which he solicited in the Merger Proxy Statement. He also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of himself and Defendants Fruchterman, Rothberg, Carfora, Robbins, Hammergren, Edelman, Phanstiel, and Schwartz, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Pettiti, including over $446,000 during the 2021 Fiscal Year following the Merger. Defendant Pettiti conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Pettiti faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

267.    Additional reasons that demand on Defendant Phanstiel is futile follow. Defendant Phanstiel has served as a Company director since February 2021. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Phanstiel was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period, including those which she solicited in the Merger Proxy Statement. She also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of herself and Defendants Fruchterman, Rothberg, Carfora, Robbins, Hammergren, Edelman, Pettiti, and Schwartz, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Phanstiel, including over $446,000 during the 2021 Fiscal Year following the Merger.

Defendant Phanstiel conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Phanstiel faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

268.    Additional reasons that demand on Defendant Schwartz is futile follow. Defendant Schwartz has served as a Company director since September 2021. She also serves as a member of the Nominating and Corporate Governance Committee and as a member of the Technology Committee. Defendant Schwartz was ultimately responsible for many of the false and misleading statements and omissions that were made by or on behalf of the Company during the Relevant Period. She also solicited the 2022 Proxy Statement, which contained false and misleading statements and contributed to the re-election of herself and Defendants Fruchterman, Rothberg, Carfora, Robbins, Hammergren, Edelman, Pettiti, and Phanstiel, which allowed them to continue making false and misleading statements. The Company handsomely pays Defendant Schwartz, including over $299,000 during the 2021 Fiscal Year following the Merger. Defendant Schwartz conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Schwartz faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

269.    Additional reasons that demand on the Board is futile follow.

270.     Demand in this case is further excused because Director-Defendants Robbins, Carfora, Edelman, Pettiti, Phanstiel, and Schwartz and non-party Joseph DeVivo are beholden to and controlled by Defendant Rothberg, a primary interested wrongdoer who is the Company's controlling shareholder. Defendant Rothberg controls their continued nomination to the Board per the terms under which the Merger was consummated. In light of this control, Defendants Robbins, Carfora, Edelman, Pettiti, Phanstiel, and Schwartz cannot impartially consider a demand against Defendant Rothberg, an interested, primary wrongdoer, as they are dependent on him for their continued employment with the Company and the compensation that goes with that. Thus, Defendants Robbins, Carfora, Edelman, Pettiti, Phanstiel, and Schwartz are unable to evaluate a demand with disinterest or independence given Defendant Rothberg's control over them.

271.     Defendants Rothberg and Robbins have deep personal and business relationships that prevent them from adequately and disinterestedly assessing a demand against each other. For example, Defendant Robbins is the founder, Portfolio Manager, and CEO of Glenview. Defendant Rothberg had founded a company called Ion Torrent Systems, Inc. that was bought in 2010 by Life Technologies Corporation, a company significantly funded by Glenview. Defendant Rothberg has publicly called Defendant Robbins "the perfect partner," who Defendant Rothberg "needed." Further, Glenview beneficially owns 17,330,506 Butterfly Class A common shares, constituting 1.8% total voting power of the Company. If Defendant Rothberg acknowledged wrongdoing at Butterfly, he would betray his business partner Defendant Robbins while simultaneously tank Glenview's investment in Butterfly, and with it, potentially Defendant Robbins' prestigious position at Glenview and his own position at Butterfly. Thus, demand is further excused as to Defendants Rothberg and Robbins.

272.    Defendants Rothberg and Edelman have deep personal and business relationships that prevent them from adequately and disinterestedly assessing a demand against each other. Defendant Rothberg founded Tesseract Health and Defendant Edelman currently serves as a medical advisor to Tesseract Health. Thus, demand is further excused as to Defendants Rothberg and Edelman.

273.    Defendants Rothberg and Phanstiel have deep personal and business relationships that prevent them from adequately and disinterestedly assessing a demand against each other. Defendant Phanstiel is the Chair of the Board of Myriad Genetics, Inc. and has been a director since 2009. In 2013, Defendant Rothberg's company Raindance Technologies directly benefitted from Myriad Genetics, Inc.'s contributing to Raindance's Series E fundraising. Thus, demand is further excused as to Defendants Rothberg and Phanstiel.

274.    Defendants Phanstiel (as Chair), Pettiti, and Robbins (the "Audit Committee Defendants") served on the Company's Audit Committee during the Relevant Period. The Audit Committee Defendants violated the Audit Committee Charter by engaging in or permitting the scheme to cause the Company to making false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Audit Committee Defendants violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures. Thus, the Audit Committee

Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

275.    In violation of the Code of Conduct, the Director-Defendants engaged in or permitted the scheme to cause the Company to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants violated the Code of Conduct by failing to act with integrity, supporting and profiting from unethical behavior, failing to avoid conflicts of interest, engaging in insider trading, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Conduct and the law. Thus, the Director-Defendants breached the Company's own Code of Conduct, are not disinterested, and demand is excused as to them.

276.    Butterfly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Butterfly any part of the damages Butterfly suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

277.    The acts complained of herein constitute violations of fiduciary duties owed by Butterfly's officers and directors, and these acts are incapable of ratification.

278.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim

exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

279.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Butterfly. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Butterfly, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

280.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Butterfly to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

281.     Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

282.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

283.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

284.     Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

285.     Under the direction and watch of the Individual Defendants, the Merger Proxy Statement and the 2022 Proxy Statement made misleading statements and omissions.

286.     Moreover, the Merger Proxy Statement and the 2022 Proxy Statement failed to disclose that the Board's oversight and risk mechanisms were not adequate given the

aforementioned misconduct and that the Code of Conduct was not complied with. The Merger Proxy Statement and the 2022 Proxy Statement also failed to disclose that Longview had failed to conduct proper due diligence of Legacy Butterfly's operations leading up to the Merger.

287.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Merger Proxy Statement and the 2022 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiffs and Company shareholders in voting on the matters set forth for shareholder determination in the Merger Proxy Statement and the 2022 Proxy Statement.

288.    The misrepresentations and omissions in the Merger Proxy Statement were material to Plaintiffs and Company shareholders in voting on the matters set forth for shareholder determination, including, *inter alia*: (1) approve the Merger; (2) approve six separate proposals to amend  Longview's Amended and Restated Certificate Incorporation; (3) elect Defendants Rothberg, Robbins, Fruchterman, Carfora, Hammergren, Pettiti, and Phanstiel as directors; (4) approve a proposal for the PIPE financing; and (5) approve a proposal to adopt  the Incentive Plan.

289.    As a result of Plaintiffs and shareholders voting to approve the Merger, the overpayment was made by the Company in consideration of the Merger.

290.    As a result of Plaintiffs and shareholders voting to approve the Incentive Plan based on Defendants' false and misleading statements in the Merger Proxy Statement, to date, under the Incentive Plan, Defendants Carfora, Hammergren, Pettiti, and Phanstiel have each received from the Company $596,369 worth of stock awards since the Merger; they will continue to receive compensation pursuant to the Incentive Plan while they remain as directors.

291.    The misrepresentations and omissions in the 2022 Proxy Statement were material to Plaintiffs and Company shareholders in voting on the matters set forth for shareholder determination therein, including but not limited to: (1) the election of Defendants Fruchterman, Fielding, Rothberg, Robbins, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, and Schwartz to the Board; (2) the ratification of Deloitte & Touche LLP as the Company's independent registered public accounting firm for the 2022 Fiscal Year; (3) the approval, on an advisory basis, of the Company's named executive officer compensation; and (4) the approval, on an advisory basis, of the frequency of future advisory votes to approve the Company's named executive officer compensation.

292.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Merger Proxy Statement and the 2022 Proxy Statement.

293.    Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

294.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

295.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Butterfly's business and affairs.

296.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

297.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Butterfly.

298.    In breach of their fiduciary duties owed to Butterfly, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) The Company did not have "strong initial adoption" or "momentum" with selling its products to Enterprise Customers, but instead sold most of its products to home users; (2) the Company utilized a practice of entering requirement contracts, and therefore continuously had to purchase product components from third-party vendors regardless of the needs of the Company; (3) as a result, the Company already experienced losses from excess product inventory that would be rendered obsolete and unusable due to excess sales forecasts that were not consistent with market demand; (4) as a further result, the Company was at risk of losing money from already existing purchase requirements from third-party suppliers; (5) in light of the foregoing, Butterfly's financial projections were impossible to attain and patently unrealistic; (6) the Company engaged in the Overpayment Misconduct; and (7) Defendants were improperly interested in increasing their future compensation by seeking shareholder approval of the Incentive Plan.

299.    As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

300.    The Individual Defendants also failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

301.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

302.    In yet further breach of their fiduciary duties, during the Relevant Period, Defendant Fielding engaged in an insider sale, netting proceeds of approximately $17,000, while

the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

303.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

304.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

305.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

306.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Butterfly has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

307.   Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

308.   Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

309.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Butterfly.

310.   The Individual Defendants either benefitted financially from the improper conduct and their making insider sales, or received profits, bonuses, stock options, or similar compensation from Butterfly that was tied to the performance or artificially inflated valuation of Butterfly, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

311.   Plaintiffs, as shareholders and representatives of Butterfly, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

312.   Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

313.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

314.    As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

315.    In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

316.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

317.    Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Abuse of Control

318.    Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

319.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Butterfly, for which they are legally responsible.

320.    As a direct and proximate result of the Individual Defendants' abuse of control, Butterfly has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

321.    Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Gross Mismanagement

322.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

323.     By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Butterfly in a manner consistent with the operations of a publicly held corporation.

324.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Butterfly has sustained and will continue to sustain significant damages.

325.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

326.     Plaintiffs, on behalf of Butterfly, have no adequate remedy at law.

## SEVENTH CLAIM

**Against Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act**

327.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

328.     Butterfly and Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Section 11 and 15 of the Securities Act and 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to

Defendant Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson's willful and/or reckless violations of their obligations as controlling shareholder, officers and/or directors of Butterfly.

329.     Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson, because of their positions of control and authority as controlling shareholder, officers and/or directors of Butterfly, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Butterfly, including the wrongful acts complained of herein and in the Securities Class Action.

330.     Accordingly, Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

331.     As such, Butterfly is entitled to receive all appropriate contribution or indemnification from Defendants Fruchterman, Fielding, Rothberg, Rodin, Robbins, Horowitz, Moore, Cribbs, and Simpson.

## EIGHTH CLAIM

### Against the Legacy Butterfly Defendants for Aiding and Abetting Breach of Fiduciary Duty

332.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

333.     The Legacy Butterfly Defendants (Defendants Rothberg, Carfora, Edelman, Hammergren, Pettiti, Phanstiel, Robbins, Schwartz, Fruchterman, and Fielding) aided and abetted the Longview Defendants who breached their fiduciary duties to the Company.

334.   The Legacy Butterfly Defendants' misconduct resulted in continuous, connected, and ongoing harm to the Company.

335.   Specifically, these Legacy Butterfly Defendants promoted the Merger by issuing and/or consenting to the issuance of false and misleading statements concerning Legacy Butterfly's products, operations, and business prospects. Moreover, the Legacy Butterfly Defendants controlled and operated Legacy Butterfly, the Company's operational predecessor, and directly made statements and/or caused Legacy Butterfly to jointly issue press releases and SEC filings which contained materially false and misleading statements promoting the Company's future operations and prospects. The Legacy Butterfly Defendants induced, through their support of the false and misleading Merger Proxy and other false statements, shareholders to vote in favor of the Merger and effectuate the Overpayment Misconduct to the Company's detriment.

336.   The Legacy Butterfly Defendants are jointly and severally liable to the same extent as the Longview Defendants are liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

337.   As a direct and proximate result of the Legacy Butterfly Defendants' aiding and abetting of the Longview Defendants' breaches of duty alleged herein, the Company has sustained and will continue to sustain substantial damages.

338.   Plaintiffs on behalf of Butterfly have no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgment in the Company's favor against all Individual Defendants as follows:

(a)   Declaring that Plaintiffs may maintain this action on behalf of Butterfly, and that Plaintiffs are adequate representatives of the Company;

(b)   Declaring that the Individual Defendants have breached or aided and

abetted the breach of their fiduciary duties to Butterfly;

(c)     Determining and awarding to Butterfly the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Butterfly and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Butterfly and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2. a provision to permit the shareholders of Butterfly to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Butterfly restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury.

Date: November 28, 2023

Respectfully Submitted,

**PHILLIPS, MCLAUGHLIN & HALL, P.A.**

/s/ *John C. Phillips, Jr.*
John C. Phillips, Jr. (Bar No. 110)
Megan C. Haney (Bar No. 5016)
1200 N. Broom Street
Wilmington, DE 19806
Telephone: (302) 655-4200
Facsimile: (302) 655-4210
Email: jcp@pmhdelaw.com
        mch@pmhdelaw.com

**OF COUNSEL:**

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
Eitan Kimelman
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
Email: peretz@bgandg.com
        eitank@bgandg.com